(COMMON LAW.)

## THELUSSON *et al.* v. SMITH.

T. brought a suit against C. in the circuit court of Pennsylvania, which was referred to arbitrators; an award was made in favour of T., and a judgment *nisi* entered on the 20th May, 1805; exceptions were filed, overruled, and judgment finally entered on the 15th of May, 1806. On the 22d May, 1805, C. executed a conveyance of all his estate to trustees, for the payment of his debts, at which time he was indebted to the United States, on several duty bonds which became due at different periods subsequent to the 22d May, 1805. Suits were brought on the bonds as they severally became due, and judgments obtained, and executions issued, under which a landed estate belonging to C. was levied upon and sold. T. brought an action against S., (the marshal of the district,) who levied the executions, to recover so much of the funds in his hands as would be sufficient to satisfy T.'s judgment. In this suit the jury found a special verdict that C. was insolvent on the 20th May, 1805, but that it was not notoriously known; and the parties agreed that on the 22d May, 1805, he was unable to satisfy all his debts, and that this fact should be considered part of the special verdict.

Held, that the word *insolvency*, mentioned in the duty act of 1790, ch. 35. sec. 45.; and repeated in the act of 1797, ch. 74. sec. 5., and of 1799, ch. 128. sec. 65. means a *legal* insolvency, which, whenever it occurs, the right of preference arises to the United States as well as in the other specified cases to which the acts of 1797 and 1799 have extended the cases of insolvency.

But if before the right of preference has accrued to the United States, the debtor has made a *bona fide* conveyance of his estate to a third person, or has mortgaged it to secure a debt, or if his property has been seized under an execution; the property is devested out of the debtor, and cannot be made liable to the United States.

A judgment gives to the judgment creditor a lien on the debtor's lands, and a preference over all subsequent judgment creditors. But the law defeats the preference in favour of the United States in the cases specified in the act of 1799, ch. 128. sec. 65.

ERROR to the circuit court for the district of Pennsylvania.

The plaintiffs in error instituted a suit in the circuit court for the district of Pennsylvania against William Crammond, which, by the agreement of the parties, and the order of the court, was. referred to arbitrators. An award was made in favour of the plaintiffs, and a judgment *nisi* was entered on the 20th of May, 1805. Exceptions were filed and overruled; and a judgment was finally entered on the 15th of May, 1806. On the 22d of May, 1805, Crammond executed a conveyance of all his estate to trustees, for the payment of his debts, at which time he was indebted to the United States, on several duty bonds, which became due at different periods subsequent to the 22d of May, 1805. Suits were instituted on these bonds as they severally became due, and judgments were obtained and executions issued, under which a landed estate belonging to Crammond, called *Sedgely*, was levied upon and sold.

The plaintiffs, considering this property as being bound by their prior judgment of the 20th of May, 1805, and that they were entitled to be first satisfied out of the money in the hands of the defendant, (the marshal of the court,) which he had raised under the above executions, issued in the name of the United States, they brought this action to recover so much of those funds as would be sufficient to satisfy their judgment.

Upon the trial of the cause in the circuit court, the jury found that Crammond was insolvent on the

20th of May, 1805, but that it was not notoriously known; subject to the opinion of the court upon a state of facts agreed between the parties, whether the plaintiffs were entitled to recover. The parties further agreed, in writing, that, on the 22d of May, 1805, Mr. Crammond was unable to satisfy all his debts, and that this fact should be considered as part of the special verdict. The other facts referred to by the jury are, in substance, those which have been mentioned. The circuit court gave judgment against the plaintiffs below, and the cause was brought by writ of error to this court.

Mr. *Hopkinson*, for the plaintiffs in error. 1. It is now settled that the insolvency of a debtor which is to give a preference to the United States over the other creditors, must be, not a mere inability to pay debts, but a legal insolvency, testified by some act of notoriety. The question is, whether the United States were entitled to a priority of payment, out of this real estate, over a judgment rendered previous to the act of insolvency, with which, and by virtue of which, the right of priority originated and attached. Whatever may be the nature and effect of the priority given by the acts of congress to the United States, it has been distinctly decided, that it is not a lien;[a] and, therefore, it is said, that a conveyance shall not be defeated by it, which would be to give it the effect of a lien. It is clear, the legislature did not consider the preference given to the

_a_ United States v. Hooe, 3 *Cranch*, 90.

United States to have the force of a lien on the real estate of the debtor, because the act of 1798, ch. 88. sec. 15., expressly gives to the United States a lien on the real estate of supervisors and other revenue officers, *from the time of the commencement of the suit against them.* Certainly it cannot be imagined the United States intended to have a less security against the delinquency of their revenue officers than in the case of ordinary debtors; on the contrary, it is unquestionable, that by the law of 1798 they intended to increase their security against their revenue officers; and yet, if the mere right of priority has the force and effect now contended for, the law of 1798 was not only unnecessary, but has really diminished the security for the payment of moneys collected by and due from these officers. That law limits the responsibility of the real estate to the commencement of the suit; whereas, the responsibility now claimed under the privilege of preference, has no limit. Should it be answered to this, that under the law of 1798, the United States are made secure even against conveyances and mortgages subsequent to the commencement of their suit, still it shows that the legislature considered a lien on the real estate of the debtor as something of a nature and effect higher and better than the mere priority they before enjoyed; and if it be so, it must hold the same rank in the hands of a citizen, and be considered superior to the priority of the United States: especially, when that priority attached after the lien was in full force and operation on the real estate of the debtor. If any argument may be drawn from the reasoning of

the counsel of the United States in other cases, where the same doctrine was agitated, it will be found, that in the case of the United States v. Fisher and others,[b] it was expressly declared, that this priority was not claimed with the creation of the debt; *nor while the debtor remained master of his own property:* and such is now the admitted law. It follows, then, that in the present case, the right of the United States did not come into being until the execution of the assignment on the 22d of May; and unless, therefore, it has a retrospective force and operation, it cannot destroy or disturb a judgment entered on the 20th of May, vesting an important and recorded right in the plaintiffs. Supposing, then, that a mere right of priority of payment could, in any case, over-reach a *bona fide* judgment, in relation to the real estate of the debtor, bound by that judgment, when the priority constitutes no lien upon it; still, the question remains, whether a subsequent right acquired by the United States can have a retrospective operation so as to overreach and defeat a prior right vested fully and fairly in a citizen. To permit this, is so contrary to all practice and equity, and to the general policy of the law, that the court will not sanction it, unless bound by the most clear and imperious authority. What, then, is the provision of the act of congress, under which this high and extraordinary privilege is claimed? After the decisions that have taken place on this subject, we are warranted in saying, that nothing is given but a priority or *preference*

<hr>

*b* 2 *Cranch,* 238.

*of payment* to the United States, in case of the insolvency of their debtor; but no lien, general or specific, on any part of his property; nothing which interferes with his control over that property; which prevents his selling it altogether; or pledging it for a debt; or exercising, *bona fide*, any of the usual acts of ownership in relation to it. A man may be a debtor to the United States, and lawfully do all these things to the moment of his *legal insolvency;* he may do them when he is actually insolvent; that is, unable to pay all his debts. In the United States *v.* Fisher,[c] this priority is declared not to affect a purchaser. In Wall. Rep. 22. a particular assignee is protected. In the United States *v.* Hooe,[d] a mortgagee in trust, as well as a mortgagee generally. Then, on what principle of law, of justice, or equity, should not a judgment receive the same favour and protection?

2. In Pennsylvania a judgment has always been considered a higher and better security than a mortgage; inasmuch as it has been supposed to give the same fixed, immovable lien, on *all* the real estate of the debtor, which a mortgage, which is also but a security for the payment of a debt, gives on a specified part of it. There is no event on which, and no means by which, the mortgagee can turn this conditional into an absolute conveyance. If the money is not paid, he must proceed to obtain a judgment on his mortgage; to take the mortgaged premises in execution; to sell them by the process and officer of the court; from whom he must receive

c 2 *Cranch,* 390.   d 3 *Cranch,* 90.

1817.

Thelusson
v.
Smith.

his debt, interest, and costs, and the surplus belongs to the debtor, as in the sale of any other property taken in execution for the satisfaction of a judgment. On what principle can it be maintained that every act of a debtor over his real estate in favour of a purchaser, or creditor, shall be available against this preference of the United States, except the most solemn of all acts, a public recorded judgment? That this priority is not a lien on the property of the debtor has been expressly decided; and, for this reason, it is not permitted to disturb a purchaser or mortgagee; it is, therefore, something less, in the estimation of the law, than a lien: how, then, can it overthrow the firmest of all liens, a judgment duly rendered? If a debtor, by a particular assignment, should appropriate his real estate to pay a debt, or a number of debts, the United States could not defeat the appropriation by their claim to a preference; and yet when he makes the same appropriation by a judgment, or, what is perhaps stronger, the law does it for him, and he certainly also intends to do it, the appropriation is invalid and ineffectual against the claim of the United States, resting on a priority arising, perhaps, years after the appropriation was thus solemnly made, and on the faith of which the innocent creditor may have trusted his all. Another strange consequence and incongruity grows out of this doctrine, so pregnant with inconvenience and injustice. A judgment has unquestionable preference over a subsequent conveyance, assignment, or mortgage. The priority, then, of the Unite ates,

1817.

Thelusson
v.
Smith,

shall not affect the conveyance, an assignment, or a mortgage, but it shall destroy that which is greater than them all. It overthrows the stronger security, while it cannot avail against the weaker. Farther; when a debtor has secured the debt by a judgment, is it not a sound principle that he cannot impair the security of his creditor by any subsequent act of his own, by any contract or conveyance he may afterwards make? How, then, can he do so by a bond given to the United States, by a contract afterwards made with them? 3. The only distinction that can be drawn between a judgment and a mortgage is, that the latter is said to be a *specific*, and the former a *general* lien; or, in other words, the one covers the whole, and the other but a part of the real estate of the debtor. This has always been considered a circumstance to the advantage of the judgment; and it is by a singular course of argument it should be now discovered to be precisely otherwise. In the first place it may be asked, why should either a general or specific lien or right be overreached by a subsequent right? and why should not the one as well as the other? There is no difference in justice or in law. A general lien at law is just as good and effectual as a specific lien. In equity a general lien is sometimes made to yield to an equity which would not disturb a specific lien; as in the case where one agrees to purchase, and pays money on the contract, he has been permitted to prevail against a judgment, but not against a mortgage. But, in this case, the purchaser must succeed on *his equity* ; for if he has none,

as if he has paid a defective consideration, he will not prevail against a judgment.[e] Further, the payment, or advance of money, must have been on the specific land, to give the equity to his claim. Have the United States any such equity in this case? They have no equity of any sort; they have advanced nothing; they have trusted nothing on the faith of this land; on the contrary, the plaintiffs have advanced their money on the faith of it: money is often lent and no other security is taken for it than a judgment. But the claim of the United States is placed mainly, if not wholly, on the words of the act of congress. What, then, is to be found there which recognises any distinction between the rights of a general and specific lien? There is nothing. The mortgagee has, therefore, been excepted on general principles of law and justice; and the same principles afford an equal protection to the judgment creditor. 4. The acts of congress state particular occurrences, insolvency for instance, from the happening of which the United States shall have a *priority of payment* over other creditors, *out of the property of the debtor;* out of the property which he has at the time of the happening of the fact, which gives the right; at the time of the insolvency, in the present case. This is the origin, the *commencement*, the creation of the right, even of priority; and there is nothing in any of the acts of congress to give a retrospective operation to this right, by which it shall

e 1 *P. Will.* 277.

overreach other rights previously vested. And as there is nothing in the words of the act to produce this effect; neither is there any thing in the legal nature of the priority to do it, inasmuch as the court has decided it is no lien; and that it has no power to disturb a previous conveyance or mortgage. The law enacts that in all cases of insolvency where the estate in the *hands of* the assignee shall be insufficient to pay all the debts due, the debts due to the United States shall be first satisfied. And any assignee who shall pay any debt due by the insolvent, out of his estate and effects, until the debts due to the United States are satisfied, shall be answerable in his own person and estate. But what, properly and legally speaking, is the *estate* of the insolvent, in *the hands,* that is, *at the disposal,* of the assignee? Surely nothing but the interest which remains in him after discharging incumbrances legally imposed upon it. 5. But it is said the assignee shall not pay *any debt* before that of the United States is satisfied; and that a judgment is a *debt,* and, therefore, to be postponed. I would rather say a judgment is the *security,* or means to enforce the payment of a debt, than that it is the debt. But if it be a debt, it is also something more than a debt; it is a debt accompanied by a lien to secure its payment; and the question is not whether the debt shall be postponed, but whether the lien shall be defeated. So the money secured to be paid by a mortgage is a debt, appearing, and, indeed, created by a bond referred to in the mortgage. The difference between the cases, then, is only this,

that the one is a debt secured by a judgment binding all the real estate; and the other is a debt secured by a mortgage binding a part of that real estate. The supposed distinction between a general and specific lien has no influence on this point in the case; and if a judgment is to be cut out on the effect of the words " *any debt*," in the act of congress, I know not what is to save a mortgage. It seems to be obvious that the law, when it speaks of *debts* to be postponed to the United States, relates only to the case of a mere debt, standing on its own strength and security, and never intended to interfere with any collateral or additional act done in relation to the debt, which gives a new right to the creditor; but that right, whatever it may be, shall have its full and fair legal operation and efficacy. If, then, the debtor has pledged his property, or given a lien upon it, or any part of it, it was never intended to disturb this right. By taking preference of a mere debt, no injustice is done; at least, no rights are destroyed; because the debtor himself might have done the same in favour of any creditor, having it in his power to give preferences; and every creditor knowing he has this power cannot complain if it is exercised. On this construction, therefore, the act of congress brings no loss upon the creditor but what he knew he was exposed to, and consented to take the chance of, when he trusted his-debtor. There is a clear distinction between taking priority of payment of a debt, and overthrowing a security, a lien, a pledge, general or specific, given for the payment of the debt.

Mr. *Jones*, contra. 1. This case is within the very terms of the 65th section of the act of March 2, 1799, ch. 128. for collection of duties. The debt was due by bond for duties; the debtor was insolvent, as well in fact as in law, according to the legal intendment of insolvency as explained in that section; his assignees, finding the estate in their hands insufficient to pay *all the debts*, have first satisfied that due to the United States, pursuant to the strict injunctions of the law, and under the peril of being chargeable, in their own persons, with the debt. The term *first*, in the section, relates simply to the antecedent " *all debts.*" Then the debt due to the United States shall be satisfied *first of all debts ;* without distinction of the quality or dignity of the other debts, whether of record, by specialty, or simple contract. So the assignees are prohibited from paying *any debt*, (without exception,) before that due the United States, at the peril of being personally chargeable. The principle upon which this court, in the case of the United States v. Hooe, construed the assignment of property mentioned in another clause of this section, to intend an assignment of *all the debtor's property*, applies more directly and forcibly to give the United States a preference over *all debts*, without exception; indeed, it can scarcely be called a construction, but a plain reading. The plaintiffs contend that one species of debt, a judgment, still maintains its former dignity and rights unimpaired; that they, as judgment creditors, ought to have been

1817.

Thelusson
v.
Smith.

preferred to the United States. Before that preten-
sion can be sustained, the plaintiffs must bring their
case within some *exception* of the law, either express
or necessarily implied. The former is out of the ques-
tion; for the directions of the law are unqualified,
and without exception. If there be any such *im-
plied*, it must be so latent, and is to be inferred only
from such remote premises, and by so refined and
subtle a process of reasoning, as would present a
strange anomaly in legislation. Surely there is no
defect of congruity or precision imputed by the coun-
sel on the other side to our construction of the law
which is, in any degree, comparable to that of leav-
ing so mportant and prominent an exception from
plain and positive terms of enactment, to be disco-
vered only by the " optics keen" of the few gifted
intellects capable of deep research and abstruse de-
ductions. As regards the great body of the commu-
nity, such a mode of legislation would be as unrea-
sonable as that of the Roman despot, who posted his
edicts so high that they could not be read, and then
punished his subjects for their involuntary disobedi-
ence. 2. No exception of one description of creditor,
any more than another, is either expressed or im-
plied. 'Tis true that the debt due to the United
States can only be satisfied out of the property of
the *debtor* himself, according to the terms of the
law; consequently, there is no necessity for any con-
structive or implied exception from the general terms
of the law: in order to save property in the hands
of a *bona fide* purchaser, from being subjected to

the payment of the vendor's debts: it is excluded *ex vi termini*, nor could it have been brought within the purview of the law, without a substantive and positive provision to that effect. A mortgagee is a purchaser; the estate is devested from the mortgagor, to whom nothing remains but an equity of redemption, and to that equity of redemption must the United States resort for satisfaction. A judgment, on the contrary, operates no devesture of property till carried into actual execution; and the debtor has the *jus disponendi* as completely after judgment as before; except that the purchaser takes *cum onere*, subject to the general lien created by the prior judgment. That lien vests no specific interest or estate in the creditor; but is nothing more than an outstanding claim, (which may or may not be enforced,) to have the judgment satisfied out of the estate: let the judgment be, in any manner, released or satisfied, and the lien is, *ipso facto*, dissolved; the estate of the vendee is instantly discharged and exonerated from the claim, without any act whatever proceeding from the creditor of the vendor to the vendee. The mortgagee trusts the mortgagor, upon the faith of a contract which specifically vests in him, the estate of the debtor, as a collateral security for the debt · the judgment creditor, on the contrary, stands upon his legal rights, has trusted nothing to the faith of contracts, and has gained nothing by contract; his advantage, whatever it be, is gained by sheer coercion upon his debtor, and by mere operation of law. To the mere operation of law, therefore, let him look for his security. The prin-

ciple of affording greater protection to rights growing out of *bona fide* contracts than to those acquired by mere operation of law, is not confined to the cases of general and specific liens as differently affected by the principle of relation incident to a state of bankruptcy, or by a prior equity; for it is a settled rule of equity to afford relief as against assignees coming into the legal estate by operation of law; when relief would be refused as against assignees or purchasers under contract for valuable consideration. 3. In order to ascertain the state of insolvency, in the life-time of the debtor, upon which the preference of the United States is to be enforced, three tests are adopted; any one of which is sufficient; and all of which must be presumed equal between themselves: 1st. An assignment of property for the benefit of creditors, at a time when the debtor has not sufficient for the payment of all his debts. 2d. His absconding, concealment, or absence, followed by *attachment* of his effects; and 3d. An act of legal bankruptcy committed. This last (inasmuch as the bankrupt law of the United States was not passed till afterwards) is presumed to comprehend, as well acts of legal bankruptcy or insolvency under *state laws*, as under the subsequent act of congress. Now, it must be presumed that congress intended all those enumerated instances of insolvency to be equivalent; and to be flowed by precisely the same consequences in relation to the rights of the United States. Then, if the debtor had become insolvent under the law of Pennsylvania, ever so long after the rendition of judgment, the prior lien would have been over-

1817.

Thelusson
v.
Smith.

reached and annulled by relation, and all the creditors reduced to a perfect equality; and such, also, unquestionably would have been the case under the bankrupt law of the United States. In either case, could the preference of the United States over *all the creditors*, thus reduced by operation of law to perfect equality, admit of doubt? A substantial distinction between the consequences attached to "an act of legal bankruptcy," and those attached to any other of the equivalent acts of insolvency enumerated in the 65th section, is altogether inconceivable. The enumeration, among those acts, of *attachments* against absconding debtors, shows what little regard was had to the strongest of all liens produced by mere process of law, and not arising *ex-contractu,* in the nature of a *bona fide* alienation of property. 4. As to the argument that has been so much pressed to prove, that because the preference of the United States does not overreach these conveyances and incumbrances, it is not in the nature of a *lien* created with the *debt ab initio ;* it may be safely admitted (and indeed it is now settled) that it is not, technically speaking, *a lien :* yet the inference that it is therefore *less* than a lien, is not so obvious. The legislature, when it is contemplated to defeat one lien, is under no necessity to effect the object through the instrumentality of another lien. Nor is there any thing absurd or incongruous in making that paramount, which, according to pre-existing rules of positive institution, was inferior. It is perfectly competent for the legislature to exalt the humble, and humble the exalted; and to declare the less to be

greater, when the relative magnitudes of the two objects are not from the nature of things, but the mere creatures of law.　Then whatever success may attend the effort to establish a specific difference between a *lien,* technically so called, and the right of preference claimed by the United States, the law is express that the latter shall prevail to place the United States *first* in the order of payment of *all debts.* It may have been deemed adequate to all the purposes of reasonable security, without attaching any specific lien upon the debtor's property, that every person who happens to be charged, either ministerially or under trust, with the administration of the insolvent's effects, is bound, at his peril, to regard the established preference in favour of the United States. 5. It is objected, that our construction gives the United States a more extensive and coercive remedy against an ordinary debtor for duties than was deemed necessary against defaulting supervisors and other officers of the revenue, upon whose estates the lien commences only with the commencement of *the suit,* according to the provisions of the act of 1798. This objection would be entirely inconclusive if it were well founded; but, in truth, it has no foundation: for not only is the commencement of suit made equivalent to attachment by the law of 1798, and any alienation whatever of the defaulting officers' estate thenceforth pervented; but that is cumulative on the general preference secured to the United States, by the 5th section of the act of the 3d of March, 1797, ch. 74.　6. The distinction insisted on, between a mere debt and a debt accompanied by a lien: between

*postponing* a debt, and defeating a *lien*, is conceived to be utterly unsubstantial. The general lien-incidental to a judgment, is the means of securing to the judgment creditor a preference over other creditors: take away his preference; postpone him to another creditor, and all the incidents by which his preference was secured are necessarily destroyed.

Mr. *C. J. Ingersoll*, on the same side. 1. The court will not fail to perceive that the question involved in this case arises, not out of the obnoxious act of the 3d of March, 1797, ch. 74., the 5th section of which gives universal and unqualified preference to the government " where any revenue officer, *or other person*, becomes indebted to the United States, by bond, *or otherwise*," but out of the act of the 2d of March, 1799, ch. 128., which affords priority to the government over individual creditors, only in the case of custom-house bonds and duties. Even the constitutionality of the law of 1797 has been questioned, though always maintained; and its policy has been the theme of severe animadversion. But the constitutionality of the law of 1799 has seldom, if ever, been drawn into doubt; and its policy is sufficiently obvious. Government could, if it would, exact payment of duties in money, or in a portion of the article imported, at the time of importation, instead of bonding the duties for future and contingent liquidation. For the accommodation of merchants, the 62d section, at their option, substitutes bonds giving time, on security, for payment, instead of exacting it on the permit to land, and delivery of the goods; for

which indulgence the priority, asserted, with notice to all the world, by the same law, is nothing more than a fair and reasonable equivalent. This priority has been established by law ever since the present government of the United States. The acts of the 31st of July, 1789, ch. 5.; of the 4th of August, 1790, ch. 35. sec. 45.; of the 2d of March, 1792, sec. 18.; and of the 2d of March, 1799, ch. 128. sec. 65., have maintained it in an uninterrupted series of legislation, uniformly sustained by this court, and by the state courts. *f* 2. The question in the case in controversy is, whether an individual judgment creditor, without execution, and, of course, having nothing in possession, nor by specific lien, is entitled to a preference, priority, and advantage, superior to that "*reserved and secured,*" by the act in question, to the public. The Sedgely estate, in dispute, was taken in execution at the suit, and by the marshal of the United States, before Thelusson *could* levy his execution. The controversy, therefore, is between a foreign individual creditor, who never had, and never could have, possession of the property, and who is fortified with no particular or specific lien against it, on the one hand; and the United States on the other hand, from whose custody and possession he alleges a superior right to take it, notwithstanding their statutory priority of apparent right. and their legal

*f* United States v. Fisher *et al.*, 2 *Cranch,* 358.     United States v. Hooe, 3 *Cranch,* 73.     Harrison v. Sterry, *et. al.*, 5 *Cranch,* 289. Prince v. Bartlett, 8 *Cranch,* 431.     M'Clean v. Rankin *et al,* 3 *Johns. Rep.* 365.     Tinker v. Smith, 2 *Day's Rep.*

priority of actual possession. The whole effect of the private creditor's judgment, at all events, goes no further than to ascertain his debt, and give him a general, not a specific, lien. Upon this judgment there *could* be no execution till on the *quarto die post,* to wit, on the 24th May; and, in that interim, to wit, on the 22d May, the general assignment took effect; intercepted the operation, destroyed all the advantages of the judgment; and created the very case which the law provides for. 3. According to the law of Pennsylvania, a judgment creditor, without execution executed, is entitled to come in only as a simple contract creditor.[g] And, in fact, a judgment is considered as no more than a debt deprived of all attributes of lien, and merely put in a course of distribution.[h] These decisions, then, dispose at once of all the argument that is introduced upon the general doctrine of the dignity of judgments; and serve, moreover, to show the fallacy of many of the ingenious difficulties with which the opposite counsel's view of the subject would embarrass the determination of the circuit court. The practice of the law does not conform to the theory he imputes to it. The judgment binds the land—as whose property? As the debtor's. But the mortgage transfers the proprietary interest to the mortgagee; and though, in point of relative rank or dignity, the judgment creditor may conceive himself entitled to the first place, yet certainly the mort-

g Gibbs v. Gibbs, 1 *Dall.* 373.

h Moliere's lessee v. Noe, 4 *Dall.* 45

gagee is much better fortified against the law in question; because, in the one case, the property is still in the original debtor, liable to the future operations of a judgment; whereas, in the other case, the property has been, in legal contemplation, conveyed away from the original debtor to his creditor, with a clause of defeasance in the event of certain conditions complied with. A particular appropriation of the estate in payment of the debt would not defeat the public preference, unless that appropriation were followed up by a conveyance of the estate, and the actual change of ownership; in which case it would be no longer the property of the public debtor. 4. The law contemplates the three cases of, 1st, death; 2d, insolvency; and, 3d, attachment; to which may, perhaps, be added, a 4th, that of legal bankruptcy; though this is nearly similar to the 3d. Now, in the case of death and insufficiency of assets, there can be no doubt. If Crammond had died on the 21st May, 1805, the United States would clearly have enjoyed the preference secured to them over the plaintiffs. And why not in like manner in the case of insolvency? All the policy and all the hardship that can be imagined for the second case, are just as applicable to the first. But because a line, which it is not necessary to contest, has been drawn, in the decisions on this subject, between the cases of popular insolvency, or mere inability to pay debts and meet engagements, and of legal, or technical, insolvency, or a public acknowledgment of that inability; efforts have been made to extricate insol-

vency from the law, when no reason can be given for it that is not equally applicable to death. The last illustration in this section is the case of legal bankruptcy; and it is well known that, under the bankrupt system, a bankruptcy cuts out a prior judgment on which no execution has been levied; and that the judgment creditor is entitled to no more than his rateable proportion, and mere dividend, in common with other creditors having no security. But the reply is, that we have no bankrupt system. Still, however, a *secret* act of bankruptcy is within our law; and, on the score of hardship, is, at least, as severe a case as any that can be set up. When a mortgagor pays a debt, or it is paid for him, this is not *any debt* within the law ; because it is specifically secured, and in legal contemplation, paid, by the transfer of a certain portion of the debtor's real estate, which the creditor holds, as it were, possession of. It is true, that in order to recover payment of the money the mortgagee must pursue the forms and process indicated by law for that purpose; but neither the mortgagor, nor any other person, can prevent his taking possession of the property mortgaged, otherwise than by paying him the money for which it is specifically pledged. The difference between such a lien and that of a mere unexecuted judgment, is perfectly obvious, and, indeed, is most emphatically recognised in the case from Peere Williams, cited on the other side. The 65th section of the act of 1799, makes no exceptions. It prohibits the payment of any debt by an assignee, under the penalty of personal accountability. Nor can the court

incorporate exceptions into the law. But where the property is no longer in the debtor's hands, as in the cases of a mortgage, a *bona fide* sale, or a *fi. fa.* levied, the property is taken out of the debtor's hands; and the court will not permit the public to carry their priority into the possession of an innocent third person. Up to the period of his assignment, Crammond continued in possession of the Sedgely estate. At that period, the Thelussons had no specific power or controul over that estate. Unless, therefore, it became, from that moment, liable to the public preference, what is that preference, and what does it amount to? To nothing more, says the opposite counsel, than a claim upon what is left after satisfying all incumbrances. If so, the law was framed, (as it evidently was,) with great pains, to very little purpose indeed. 5. As to the argument drawn from the supposed admission of counsel *arguendo* in the case of the United States v. Fisher, it is true, that while the debtor remains master of his property, the priority cannot dispossess him on the plea of a popular insolvency, or inability to pay his debts. It is equally true that the priority has no pretensions to be deemed a lien. But it nevertheless may have force enough to operate whenever the insolvency is announced, by intercepting the mere *prospective* security of a judgment creditor without execution. But this is no retrospective operation. 6. As to the comparative equities, the surety, or assignee, who pays the bond, on the faith of this act of congress, has at least as much to recommend him on that score, as the mere judgment creditor, of the nature of whose debt nothing is known;

and since the various, the decided, and the consist- ent determinations of different courts, both state and national, in support of this law, there can be no ques- tion on which side the hardship preponderates.

Mr. *Hopkinson*, in reply. 1. It is said that the Sedgely estate was taken in execution at the suit of the United States, before Thelusson *could* levy his execution; who, therefore, never could have pos- session of the property, and yet endeavours to take it from the custody and possession of the United. States. I do not apprehend that this is a question on the right of possession in the property taken in execution; nor is it at all material at whose suit the property was so taken and sold. Neither party ever had a possession, either actual or legal. If the pos- session, asserted to have been held by the United States under their execution, gives them a right which cuts out the antecedent judgment, it is needless to resort to the protection and power of the act of congress to strengthen it, and any other creditor obtaining the same sort of possession would have the same right, and might assume the same prefer- ence over antecedent judgments. It does not ap- pear, by the special verdict, when the execution at the suit of the United States was taken out and le- vied; and, therefore, there is no foundation in the record for saying it was done before Thelusson *could* levy his execution. The decision of the question must turn on the *statutory priority* of the United States; and not on *their legal priority of ac- tual possession*—they never have had any such pos-

session, 2. It cannot surely be imagined that the assignment of Crammond, made on the 22d of May, because it happened before the expiration of four days after the date of our judgment, did, therefore, *per se*, interrupt the operation or destroy the advantages of the judgment. If so, then the effect has been produced by virtue of the assignment, and not by the provisions of the act of congress. The fact, however, is not so; the date of the assignment is material only to fix the period of the insolvency; of the circumstance which gave right to the preference of the United States, whatever it is: but whether it shall take preference of the judgment is the matter to be decided by the act of congress, and not by the legal force or operation of the assignment; which, to all the purposes of this argument, is the same whether made three days or thirty days after the judgment. The time when you may issue an execution under a judgment is no limitation of the power of the judgment to bind the real estate; otherwise, a sale made within the four days would be valid and effectual. 3. The case of Gibbs v. Gibbs,[i] was that of a judgment creditor without an execution; another judgment creditor with an execution executed; and then a legal bankruptcy; there being at that time, a regular bankrupt law in Pennsylvania. The question was between the two judgments. Did the second judgment creditor pretend to take priority by virtue of its execution, or by that " actual possession" which is

i 1 *Dall.* 371.

1817,

Thelusson
v.
Smith.

set up in our case ? No! The second judgment credi-
tor claimed because the words of the bankrupt law ex-
pressly included the case of his opponent, taking away
his right, and did not so include or affect his own judg-
ment or right. The question arose under the 30th
section of the bankrupt law, which expressly declares
" that every creditor, having security for his debt by
judgment, &c., whereof there is no execution served
and executed upon the lands, goods, and estate of the
bankrupt, &c., shall not be relieved for any more
than a rateable proportion of their debts," &c. The
creditor, therefore, in that case, whose judgment was
unexecuted, was expressly excluded; and he whose
judgment was executed, was as expressly saved by
the terms of the act. The reason given for this con-
struction of the bankrupt law, does not apply to our
case. It is, that the estate *vested in the commission-
ers,* by the act of bankruptcy; but so far is this from
being the effect of an act of insolvency by the act of
congress, that it has been decided that the right ac-
quired by the United States, by the insolvency, is a
mere right of *priority of payment,* without even crea-
ting a lien on the real estate to secure it. The case of
Moliere's lessee v. Noe,[k] arose under the intestate laws
of Pennsylvania. These laws authorize a sale of the
real estate of an intestate, under certain circumstan-
ces, by the administrator, by the order and sanction
of the orphan's court. A house and lot of an intes-
tate had been thus sold. Certain judgments had
been obtained against the intestate in his life-time;

[k] 4 *Dall.* 450.

and the question was between these judgment creditors and the purchaser from the administrator under the order of the orphans' court. The decision is made in favour of the latter, on a review of the several laws of the state on the subject, and the clear intention of the legislature. No principle is affirmed at all applicable to our case. The court say, that the word "*debts*," in its most general sense, and as used in those acts of assembly includes a judgment; and that general words will not be restrained to particular cases, unless to avoid absurdity, contradiction, or *flagrant injustice*. They then observe that neither will occur in their case. No inconvenience; "because the lands will sell better for being discharged from liens; and it makes no odds to the judgment creditors by whom they are sold, provided they are sold fairly, and the proceeds faithfully applied." The court then go on to declare that in the application of the proceeds *the judgment creditors shall have their preference, and all the benefit of their lien;* and that it would be *monstrous injustice* were it otherwise. This case gives no countenance to the suggestion that in Pennsylvania a judgment is considered as no more than a debt deprived of all attributes of lien, and merely such in the course of distribution. 4. In Pennsylvania it is the constant practice for the mortgagor to keep possession, not only of the land, but of all the deeds and instruments of title; that he sells and disposes of the property, and delivers possession to the purchaser, who holds it, subject, indeed, to the mortgage as he would de

to a judgment; and in no respect differently; and that a judgment is specific enough in its force and operation to have preference of a subsequent mortgage; which a mere debt by simple contract, or by specialty, would not do. Why, then, shall it not have the same preference over a mere priority of payment arising after its date? 5. The equality to which a bankruptcy reduces a judgment creditor with the other creditors of the bankrupt is greatly relied upon by the defendant; but it is the effect of the positive provision of the statute meeting the case in terms, and founded on the peculiar policy of that system; neither of which is found in the act of congress now under consideration. It is said there is no difference, in reason, between the effect of a bankruptcy, and a legal insolvency; and as the former would destroy the right and lien of a judgment, so should the latter. The answer is obvious. The bankruptcy does it by virtue of the express terms and provisions of the statute; and if the same authority can be found in the case of insolvency, it will stand on the same reason, or, rather, the same right. No case has been shown where a judgment creditor has been deprived of his right, his lien, his interest in the land, his preference, by construction; by the use of general terms: and in the case of Moliere's lessee v. Noe, his right of priority of satisfaction out of the proceeds of the estate, is expressly recognised, and the contrary doctrine held to be " monstrous injustice."

Mr. Justice WASHINGTON delivered the opinion of the court.

*(margin)* 1817. Thelusson v. Smith.

*(margin)* March 18th.

the court, and after stating the facts, proceeded as follows.

Two questions were made in the circuit court. 1st. At what time a judgment *nisi* on an award of arbitrators, made under an order of court, binds the real estate of the defendant against whom the award is made; whether on the day it is rendered; or on the *quarto die post*, if no exceptions be filed; or on the day when the exceptions, if any are filed, are overruled. 2. If from the time when the judgment *nisi* is entered; then whether, in this case, the United States are entitled to be paid in preference to the judgment creditor?

The first question was not decided by the court below, and is not contested in this court.

In considering the second question, it will be assumed, for the sake of the argument, that the judgment *nisi* binds the real estate of the debtor from the time it is rendered.

This question did not arise in the cases of the United States v. Fisher *et al.*[l] or in that of the United States v. Hooe *et al.*[m] The point decided in those cases was, that a mere state of insolvency or inability in a debtor to the United States to pay all his debts, gives no right of preference to the United States, unless it is accompanied by a voluntary assignment o all the property for the benefit of his creditors. There can be little doubt but that the word *insolv.ncy*, mentioned in the act of 1790, ch.

l 2 *Cranch*, 358.          m 3 *Cranch*, 73.

35. sec. 45., and repeated in the act of 1797, ch. 74. sec. 5., and of 1799, ch. 128. sec. 65., means a *legal* insolvency, which, whenever it occurs, the right of preference arises to the United States, as well as in the other specified cases to which the acts of 1797 and 1799 have extended the cases of insolvency.

In this case, the conveyance of Crammond, on the 22d of May, 1805, was of all his property; at which time he was unable to pay all his debts: it is, therefore, a case precisely within the law and within the principle decided by the above cases.

But the question still remains to be decided whether this right of preference which accrued on the 22d of May can cut out a prior judgment creditor? The law declares " that in all cases of insolvency, &c. the debts due to the United States shall be first satisfied, and if the assignees, &c. shall pay *any debt* due by the person or estate from whom or for which they are acting, previous to the debts due to the United States from such person or estate being first duly satisfied, they shall become answerable for the same in their own persons and estates." These expressions are as general as any which could have been used, and exclude all debts due to individuals, whatever may be their dignity. The assignees are made personally responsible to the United States if in case of insolvency, they pay *any debt* previous to those due to the United States. The law makes no exception in favour of prior judgment creditors; and no reason has been, or we think can be, shown to warrant this court in making one.

Vor. N.                3 H

Exceptions there must necessarily be as to *the funds* out of which the United States are to be satisfied, but there can be none in relation to the debts due from a debtor of the United States to individuals. The United States are to be first satisfied; but then it must be out of the debtor's estate. If, therefore, before the right of preference has accrued to the United States, the debtor has made a *bona fide* conveyance of his estate to a third person, or has mortgaged the same to secure a debt, or if his property has been seized under a *fi. fa.*, the property is devested out of the debtor, and cannot be made liable to the United States. A judgment gives to the judgment creditor a lien on the debtor's lands, and a preference over all subsequent judgment creditors. But the act of congress defeats this preference in favour of the United States, in the cases specified in the 65th section of the act of 1799.

The judgment of the circuit court, therefore, is to be affirmed with costs.

Judgment affirmed.[h]

[h] The above is the opinion delivered by Mr. Justice WASHINGTON, in the circuit court, and which he was directed to deliver as the opinion of this court.