*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0269p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

DETROIT RECEIVING HOSPITAL AND
UNIVERSITY HEALTH CENTER; OAKWOOD
ANNAPOLIS HOSPITAL; BEYER HOSPITAL;
BOTSFORD GENERAL HOSPITAL; OAKWOOD
HOSPITAL AND MEDICAL CENTER; GARDEN
CITY HOSPITAL; GENESYS REGIONAL
MEDICAL CENTER; GRACE HOSPITAL;
HARPER HOSPITAL; OAKWOOD HERITAGE
HOSPITAL; HURLEY MEDICAL CENTER;
HURON VALLEY HOSPITAL; HUTZEL
HOSPITAL; METROPOLITAN HOSPITAL;
MOUNT CLEMENS GENERAL HOSPITAL; PORT
HURON HOSPITAL; REHABILITATION
INSTITUTE OF MICHIGAN; ST. LUKE'S
HOSPITAL OF KANSAS CITY; OAKWOOD
SOUTHSHORE MEDICAL CENTER; SINAI
HOSPITAL; SPECTRUM
HEALTH-BUTTERWORTH CAMPUS; W. A.
FOOTE MEMORIAL HOSPITAL; UNIVERSITY OF
MICHIGAN HOSPITALS AND HEALTH
CENTERS,

>  No. 08-1920

     *Plaintiffs-Appellants,*

  *v.*

KATHLEEN SEBELIUS, In her official capacity
as Secretary of Health and Human Services,
     *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-11181—Avern Cohn, District Judge.

Argued:  June 16, 2009

Decided and Filed:  July 30, 2009

Before:  CLAY and ROGERS, Circuit Judges; JORDAN, District Judge.[*]

_____

 [*]The Honorable R. Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

————————————

**COUNSEL**

**ARGUED:** Andrew S. Doctoroff, HONIGMAN MILLER SCHWARTZ AND COHN LLP, Detroit, Michigan, for Appellant.  Steven P. Croley, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.  **ON BRIEF:** Andrew S. Doctoroff, Kenneth R. Marcus, HONIGMAN MILLER SCHWARTZ AND COHN LLP, Detroit, Michigan, for Appellant.  Elizabeth J. Larin, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

————————————

**OPINION**

————————————

ROGERS, Circuit Judge.  The plaintiffs are hospitals that provide services to patients under both Medicare and Medicaid.  Medicare beneficiaries are billed co-payments and deductibles for the services provided to them, and in some cases the Medicare beneficiaries cannot or will not pay.  The beneficiaries in this case also have Medicaid as a secondary insurer, and Medicaid may cover these out-of-pocket costs, but in some circumstances Medicaid only partially covers them.  The plaintiff-hospitals all do business in states that cap the amount of such Medicaid payments.  In these states, Medicaid prevents the hospital from recovering the remaining portion of the fees from the beneficiary.  The hospitals are left, therefore, with unrecoverable bad debt.

The Medicare Act states that the Secretary of Health and Human Services will promulgate regulations to ensure that the costs of Medicare will not be borne, or cross-subsidized, by individuals not covered by Medicare.  Because of this provision, the Medicare program historically covered all bad debts attributable to Medicare patients.  In 1997, Congress in the Balanced Budget Act amended the Medicare Act to provide a percentage reduction of the amount of bad debt that would be reimbursed by Medicare.  The provider can make up for the remaining loss by continuing collection efforts against Medicare beneficiaries, except when the beneficiaries are also covered by Medicaid, as the Medicaid Act disallows such efforts.  The plaintiffs allege that the provider is

effectively forced to recoup the remaining loss attributable to dually-covered Medicare/Medicaid patients from funds paid by non-Medicare patients.

The plaintiffs brought suit against the Secretary, arguing that this scheme violates the Medicare Act's cross-subsidization ban. The plaintiffs argued that the Secretary's regulation, promulgated under the 1997 bad debt reimbursement reduction statute, is invalid and that there should be an exception to the bad debt reimbursement reduction for debt arising from services provided to dually-covered beneficiaries. The district court granted summary judgment in favor of the Secretary. It is questionable to characterize Medicare's effective incorporation of Medicaid cost limits as "cross-subsidization" rather than simply as "rate setting." In any event, the statutory scheme is clear on its face and does not allow for the exception that plaintiffs seek to the statutory reduction in Medicare reimbursement for bad debt. The district court thus properly entered judgment for the Secretary.

## I.

Under the Medicare program, 42 U.S.C. §§ 1395 *et seq.*, the federal government pays the cost of eligible health care expenses for the aged and disabled. Medicare Part A authorizes the Secretary to pay for inpatient institutional care, primarily at hospitals. § 1395c. Medicare Part B provides optional supplemental insurance for physician's services, outpatient hospital care, and medical equipment. §§ 1395j, 1395k. As under a private insurance plan, Part B enrollees are responsible for co-payments and deductibles. §§ 1395j, 1395l, 1395r, 1395s.

Under both Part A and Part B, Medicare pays for services that are medically reasonable and necessary for the beneficiary. § 1395f(a)(2). Before 1983, the Medicare statute provided that hospitals be paid for the services rendered based on a retrospective determination of the "reasonable cost" for the service. § 1395(x)(v). Since 1983, hospitals are paid based on a fixed-rate system, where the provider is paid a standard rate per treatment at the time of discharge. § 1395ww(d). Some costs, including those at issue in this case, are still reimbursed on a retrospective basis. In creating regulations

regarding the payment of reasonable costs, the Secretary must ensure that the Medicare program is self-sustaining: Regulations promulgated by the Secretary

> shall (i) take into account both direct and indirect costs of providers of services . . . in order that . . . the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter *will not be borne by individuals not so covered*, and the costs with respect to individuals not so covered will not be borne by such insurance programs . . . .

§ 1395x(v)(1)(A) (emphasis added); *see also* 42 C.F.R. § 413.80(d). This "cross-subsidization" ban was in the original statute and is part of the definition of "reasonable cost." Social Security Amendments of 1965, Pub. L. No. 89-97, § 1861(v)(1), 79 Stat. 322-23.

Bad debts of Medicare enrollees are treated as "reasonable costs," and are reimbursed to hospitals on a retrospective basis. Bad debts arise when the hospital cannot recover co-payments and deductibles from Medicare enrollees despite reasonable collection efforts. 42 C.F.R. § 413.89(e). Historically, the Secretary reimbursed bad debt in full. However, in 1997 Congress decreased the amount of bad debt reimbursement in order to combat rising Medicare costs, Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4451, 111 Stat. 251, and provide the hospitals an impetus to make collection efforts, H.R. Rep. No. 105-149, at 1344 (1997).

> [T]he amount of bad debts otherwise treated as allowable costs which are attributable to the deductibles and coinsurance amounts under this subchapter shall be reduced—
>
>> (i) for cost reporting periods beginning during fiscal year 1998, by 25 percent of such amount otherwise allowable,
>> (ii) for cost reporting periods beginning during fiscal year 1999, by 40 percent of such amount otherwise allowable,
>> (iii) for cost reporting periods beginning during fiscal year 2000, by 45 percent of such amount otherwise allowable, and
>> (iv) for cost reporting periods beginning during a subsequent fiscal year, by 30 percent of such amount otherwise allowable.

§ 1395x(v)(1)(T).  The Secretary promulgated a regulation that mirrors the statute at 42 C.F.R. § 413.89(h)(1).  For the remaining bad debt, the hospitals must either accept the loss or continue to pursue debt collection from the Medicare beneficiary.

Some Medicare beneficiaries are also enrolled in Medicaid, and Medicaid pays their copayments and deductibles, which generally prevents bad debt with respect to Medicaid beneficiaries.  Medicaid is a federal-state program that pays the cost of necessary medical expenses for low-income individuals. 42 U.S.C. § 1396.  Individuals covered by both Medicare and Medicaid, or qualified Medicare beneficiaries ("QMBs"), include those who are enrolled in both programs, by virtue of their age or disability and their low-income, and also those who are enrolled in Medicare and have an income level not low enough to qualify for Medicaid but low enough to make them unable to pay Medicare co-payments and deductibles. §§ 1396d(p)(1), 1396a(a)(10)(E)(i).  Medicare pays a QMB's medical expenses, but state Medicaid agencies are responsible for "Medicare cost-sharing," including paying a QMB's co-payments and deductibles. § 1396d(p)(3).

However, as permitted under federal law, Michigan and Missouri have placed caps on the Medicare cost-sharing under their Medicaid programs.  The caps can result in reduced payments to hospitals for the services provided to QMBs.  In the Balanced Budget Act of 1997, § 4714(a)(2), Congress provided that:

> [A] State is not required to provide any payment for any expenses incurred relating to payment for deductibles, coinsurance, or copayments for medicare cost-sharing to the extent that payment under [Medicare] for the service would exceed the payment amount that otherwise would be made under the State [Medicaid] plan . . . for such service if provided to an eligible recipient other than a medicare beneficiary.

42 U.S.C. § 1396a(n)(2).  Under this provision, if the Medicare payment rate for the QMB's treatment is above the rate that the state Medicaid program pays for the same treatment, the state Medicaid program pays no additional amount for co-payments or deductibles.  If the Medicare payment rate is below the Medicaid rate, the state Medicaid program pays only the additional amount necessary to provide the hospital with the Medicaid rate amount.  For example, if the provider charges $100 for a service to the

QMB and Medicare pays $80, a $20 co-payment remains.  If the state Medicaid rate for that service is $70, Medicaid pays nothing and the provider is shortchanged $20 if the QMB does not pay his co-payment.  If the state Medicaid rate for the service is $90, Medicaid pays the $10 difference between the Medicaid and Medicare rates, and the provider is shortchanged $10 if the QMB does not pay his co-payment.  The example is drawn from *Community Hospital of Monterey Peninsula v. Thompson*, 323 F.3d 782, 786-87 (9th Cir. 2003).  In states with this payment cap, QMBs are not responsible for payments and the Medicaid Act prohibits hospitals from engaging in debt collection efforts against QMBs.  § 1396a(n)(3).

Plaintiffs are all hospitals in Michigan and Missouri, alleging that the limits on bad debt reimbursement, when coupled with the Medicaid cost-sharing cap, result in a loss for the hospitals that can only be covered through cross-subsidizing from non-Medicare funds.  From 1998 through 2000, each hospital filed a Medicare cost report at the end of the fiscal year with a Medicare fiscal intermediary, which pays providers for covered services on the Secretary's behalf.  Each hospital included in its cost report bad debt arising from services furnished to QMBs.  The hospitals requested full reimbursement of their Medicare bad debt.  The fiscal intermediaries found that the bad debt was an "allowable" reasonable cost of services provided, 42 C.F.R. § 413.89(e), but only reimbursed a portion of the bad debt at the percentages set out in 42 C.F.R. § 413.89(h)(1).

The hospitals requested a hearing with the Provider Reimbursement Review Board (PRRB) regarding their reimbursements for 1998-2000.  The hospitals asked for full reimbursement of bad debt related to QMBs.  The hospitals also requested "expedited judicial review," which allows the PRRB to certify that it lacks the authority to decide a "question of law or regulations relevant to the matters in controversy." 42 U.S.C. § 1395*oo*(f)(1).  The PRRB found that it was bound to reimburse bad debt at the levels set out in the Secretary's regulation, and that the PRRB lacked authority to decide the legal question of the validity of the regulation.  The PRRB therefore could not

provide the hospitals with the relief sought and granted expedited judicial review, which was a final agency decision. § 1384*oo*(f)(1).

The hospitals filed a claim against the Secretary in the Eastern District of Michigan. The hospitals alleged that the Secretary's construction of 42 U.S.C. § 1395x(v)(1)(T), set forth in 42 C.F.R. § 413.89(h)(1), is unlawful as it applies to QMB bad debt because it creates a loss for the hospitals that can only be covered by obtaining funds from non-Medicare patients, in violation of § 1395x(v)(1)(A). On the Secretary's motion for summary judgment, the district court found enough tension between Medicare's cross-subsidization ban and its bad debt reimbursement reduction provision to find a statutory ambiguity in the context of QMB bad debt. The district court determined that the Secretary's regulation regarding bad debt reimbursement reduction was a resolution of that ambiguity, warranting deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because it was reasonable. *Detroit Receiving Hosp., et al. v. Leavitt*, 561 F. Supp. 2d 795, 802-04 (E.D. Mich. 2008). The district court granted summary judgment in favor of the Secretary, and this appeal followed.

## II.

The hospitals are not entitled to the relief they seek, because the statutory scheme is clear on its face and provides no exceptions to the bad debt reimbursement reduction for QMB bad debt. The statutory provisions can be read consistently: the bad debt reimbursement reduction can be viewed as an overall reduction in payment rates for patients who are covered under both Medicare and Medicaid, which does not violate § 1395x(v)(1)(A)'s cross-subsidization ban. Furthermore, § 1395x(v)(1)(A) applies only to the Secretary in the context of promulgating regulations, and simply does not limit Congress's ability to enact more specific legislation.

Our analysis begins and ends with the statute, because the provisions at issue are clear. *See Chevron*, 467 U.S. at 842. Section 1395x(v)(1)(T) provides for a reduction in bad debt reimbursement. It provides no exceptions. We "must presume that a legislature says in a statute what it means and means in a statute what it says there.

When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002) (quotation marks and citation omitted). Congress did not provide an exception for QMB bad debt and there is no basis for us to create one. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004).

Bad debt reimbursement is reduced according to the statute's provisions without regard to whether the patient is a QMB, and § 1395x(v)(1)(A)'s cross-subsidization ban is not inconsistent with that provision. These statutory provisions can be read consistently.[1] Congress's decision to limit bad debt reimbursement may be characterized not as cross-subsidization, but simply as a setting of Medicare payment rates closer to Medicaid payment rates. Providers of services to QMBs are sometimes paid at a higher rate under Medicare than they would have received under Medicaid for the same services. H.R. Rep. No. 105-217, at 491-92 (1997). In enacting the 1997 legislation, Congress was reducing the Medicare payment rates for QMB patients to a level closer to that which hospitals may be paid for their services under Medicaid. For instance, where the bad debt is either a $20 or $10 co-payment, the hospital receives a 70% reimbursement and a $6 or $3 loss remains, respectively. Section 1395x(v)(1)(T), therefore, imposes a constructive Medicare payment rate of $94 or $97 for QMBs, rather than the $100 rate for other Medicare beneficiaries. The total Medicaid reimbursement in those examples for a patient covered by Medicaid alone would be $80 and $90 respectively. Congress specifically enacted this provision of the Balanced Budget Act to combat the rising cost of Medicare bad debt—between 1990 and 1994, reimbursement of bad debt increased by 165% from $415 million to $1.1 billion. Proposed Rules,

---

[1]The hospitals' reliance on *Abington Crest Nursing and Rehabilitation Center v. Leavitt*, 541 F. Supp. 2d 99, 105-06 (D.D.C. 2008), to show that the statutory scheme is ambiguous is misplaced. In that case, the providers were being paid under a separate rate schedule (42 U.S.C. § 1395w-4) that was not based on the "reasonable cost" provisions of the statute (42 U.S.C. § 1395x(v)), which contain the cross-subsidization limitation. 541 F. Supp. 2d at 105. The providers wanted the bad debt reimbursement (then provided for by regulations implementing the reasonable cost provisions) to apply to their payment scheme as well, and the statute and regulations were silent about the issue, creating an ambiguity. *Id.* Here, however, the hospitals are paid under the "reasonable cost" structure set out in the statute and the amendments to the statute specifically address the amount of bad debt reimbursement. Although in *Abington* Congress's silence regarding whether a provision in one part of the statute applies in a different context may have been ambiguous, here the statute is being applied in the exact context the statute describes.

Department of Health and Human Services, 68 Fed. Reg. 6682, 6684 (Feb. 10, 2003) (to be codified at 42 C.F.R. pt. 413). The bad debt reimbursement reduction was an attempt to lower the cost of Medicare services. The hospitals choose to provide Medicare services, 42 U.S.C. § 1395z, and lower rates can be considered a cost of doing business with Medicare. If Congress had simply lowered its Medicare payment rates to Medicaid levels, the hospitals would hardly have a claim that the cross-subsidization ban was violated. Nor do they here.

This conclusion is supported by our reasoning in *Detroit Receiving Hospital v. Shalala*, 194 F.3d 1312 (table), 1999 WL 970277 (6th Cir. Oct. 15, 1999). That case dealt with an administrative rule that disallowed bad debt reimbursement in certain circumstances. We held that the disallowance of bad debt reimbursement did not result in cross-subsidization, even though the agency interpretation in that case, according to the hospital, required the hospital "to forfeit the entire amount of the expense even though its best estimate is that only 5% of it would have been collectible. . . . [S]imply because [the Secretary] disallows certain bad debts does not mean that non-Medicare individuals necessarily pay these costs." *Id.* at *6. (We do not mean to hold, however, that the cross-subsidization limit may not be used as a factor in evaluating Medicare rules that are not compelled by statute. *See, e.g.*, *Bedford County Mem'l Hosp. v. HHS*, 769 F.2d 1017, 1023 (4th Cir. 1985).)

Moreover, by its terms, § 1395x(v)(1)(A) applies only to the promulgation of regulations by the Secretary: "*Such regulations* shall (i) take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered . . . ." *Id.* (emphasis added). The provision does not purport to limit Congress's own ability to enact legislation that may result in cross-subsidization. Section 1395x(v)(1)(T)'s bad debt reimbursement reduction amends the definition of what is a "reasonable cost" for hospitals under Medicare, and Congress has the power to define that term. When viewed in this fashion, the statutory provisions are read, as

the Supreme Court instructs us to do, as "a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995), where "all parts [fit] into an harmonious whole," *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959).

Given this statutory scheme, the Secretary's promulgation of a regulation that mirrors the statute cannot violate § 1395x(v)(1)(A)'s cross-subsidization ban.  The language of 42 C.F.R. § 413.89(h)(1) merely parrots the statute; it need not have been enacted for the bad debt reimbursement reduction to be effective.  The Secretary is simply doing what the statute requires.  The promulgation of a regulation that expresses, word for word, the will of Congress does not violate the cross-subsidization ban.

Even if the statutory provisions were in tension, § 1395x(v)(1)(T)'s bad debt reimbursement reduction provision would govern.  "[A] specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended." *United States v. Estate of Romani*, 523 U.S. 517, 530-31 (1998).  The ban on cross-subsidization is an over-arching provision that generally guides the Secretary in promulgating regulations regarding reasonable costs for which providers will be reimbursed.  The 1997 legislation provides specific instructions to the Secretary about the levels of reimbursement allowable for one type of reasonable cost—bad debt.  "Over time, . . . subsequent acts can shape or focus [the statute's] meanings.  The 'classic judicial task of reconciling many laws enacted over time, and getting them to "make sense" in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.'" *FDA v. Brown & Williamson Tobacco*, 529 U.S. 120, 143 (2000) (citing *United States v. Fausto*, 484 U.S. 439, 453 (1988)).  Here "Congress has spoken subsequently and more specifically to the topic at hand," *id.* at 133, which informs a proper construction of the statutory scheme.

Furthermore, if the statutory provisions somehow were in direct conflict, the 1997 amendment is later in time and would govern.  *See Watt v. Alaska*, 451 U.S. 259, 266-67 (1981).  The cross-subsidization ban was enacted as part of the original legislation in 1965.  The 1997 Balanced Budget Act included both § 1395x(v)(1)(T)'s

bad debt reimbursement reduction and § 1396a(n)(2)'s ban on QMB debt collection, which together create the asserted tension with the limit on cross-subsidization. The subsequently-enacted legislation contains no exception for QMB bad debt.  If there were a conflict, the later-in-time provision would govern, as in *United States v. Belt*, 319 U.S. 521, 543 (1943).

Finally, there is no need to resolve the precise level of deference properly to be accorded to the Secretary in this case.  *See Royal Geropsychiatric Servs., Inc. v. Tompkins*, 159 F.3d 238, 245 (6th Cir. 1998).  Because the statute, as interpreted by the Secretary, is clear on its face, we need not determine whether deference is required under *Chevron*, 467 U.S. at 842-43, *United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001), or *Auer v. Robbins*, 519 U.S. 452, 457 (1997).

AFFIRMED.