Susan COKER, Plaintiff–Appellant,

v.

TRANS WORLD AIRLINES, INC.,
et al., Defendants–Appellees.

No. 97–2140.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 3, 1997.

Decided Jan. 15, 1999.

Suzanne McCarthy (argued),Chicago, IL, for Plaintiff–Appellant.

Thomas J. Piskorski (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendants–Appellees.

Before WOOD, Jr., RIPPLE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Few things are more important to people in this uncertain world than their medical insurance, if indeed they are fortunate enough to find themselves in the 85% of the United States population that enjoys some level of coverage. 1997 Statistical Abstract of the United States § 2, Table 171 (reporting 1995 data). In many instances, this coverage is provided through an employer-sponsored welfare benefit plan regulated by the Employee Retirement Income Security Act, better known as ERISA, 29 U.S.C. § 1001 *et seq.* In this case, Trans World Airlines, Inc. (TWA) mistakenly (and for a substantial period of time) misinformed Douglas Coker and his wife Susan that they were covered by medical insurance when in fact those benefits had ended. When it caught the error, TWA immediately terminated the benefits, leaving Susan with a large medical bill for certain hospital stays. The Cokers sued under ERISA for benefits wrongfully denied, but the district court granted summary judgment for TWA. Susan has now appealed, claiming that TWA was legally estopped from cutting off her benefits. In our view, the district court properly understood the narrow limits of the doctrine of estoppel as it applies in ERISA cases, and we therefore affirm its judgment.

## I

From October 1986 until his furlough at the end of September 1992, and then again after his reinstatement in June 1995, Douglas Coker worked for TWA as a ramp service employee at O'Hare International Airport in Chicago. (As of the time of oral argument, he was working part-time at both TWA and at United Airlines.) In that capacity, Douglas was a member of District Lodge 142 of the International Association of Machinists and Aerospace Workers, AFL–CIO (IAM). The collective bargaining agreement (CBA) between the IAM and TWA created various group benefit plans, including the medical insurance at issue here. Article 20 of the CBA provided that a furloughed employee with at least 10 years of compensated service would continue to receive medical coverage for 12 months after the date of furlough or until the employee obtained new employment, whichever happened first. The summary plan description (SPD) that TWA made available to its employees reflected this same information, though it clarified that benefits would cease upon reemployment only where the employee received insurance coverage from the new job. Even though his tenure at TWA was less than 10 years, Douglas qualified for this coverage under Article 20 because before 1986 he had been an Ozark Airlines employee; TWA acquired Ozark in October 1986 and counted Ozark service toward accrual of these benefits. Susan Coker was a covered dependent under Douglas' plan.

On September 30, 1992, Douglas and a number of other TWA employees were furloughed by the airline. On that day, TWA held a meeting for the group that was about to be laid off. The TWA local station manager handed out a memorandum laying out the continuing medical benefits that employees of Douglas' seniority level enjoyed. First, the memorandum explained that TWA was obligated under the CBA to provide 12 months of medical coverage for Douglas and Susan. Second, it indicated that Douglas and Susan had the option of purchasing, at their own expense, continued health coverage pursuant to the relevant version of the Consolidated Omnibus Budget Reconciliation Act (CO-BRA), 29 U.S.C. § 1161 *et seq.*, "for a maximum period of 18 months after [the] ... furlough date." Taken together, these two provisions meant (for employees who did not find other employment with medical insurance) that the first 12 months post-furlough would be covered by TWA, and an additional 6 months could be purchased by the Cokers if they filed a timely application for COBRA benefits. (In November 1992, TWA also mailed a letter to the furloughed employees that repeated this information, but because the Cokers dispute whether they received that letter, we disregard it in our analysis of the case.)

The one-year anniversary of Douglas' furlough, September 30, 1993, came and went

without incident. Too much without incident, in fact, because the Cokers took no steps at that time or any other to exercise their CO-BRA option. Notwithstanding that omission, a bureaucratic snafu at TWA caused the company to continue carrying Douglas as· a covered employee (and Susan, as a dependent). March 30, 1994, would have been the last day on which the Cokers were eligible for COBRA benefits if they had paid for them, but it too passed without any changes in their status. Quite to the contrary, in both November 1993 and November 1994, TWA sent new insurance and prescription benefit cards to the Cokers. The Cokers did not question their good fortune. Indeed, they were passive in more ways than one. After his layoff, Douglas held several part-time and full-time jobs. Some of those positions did not include health care benefits, but he had a part-time job at United Airlines from May 1993 until April 1994, and then again from May 1995 until the present, under which he was eligible for medical benefits. Despite the provision in the CBA and SPD that TWA-paid medical benefits would expire if Douglas were reemployed with health care benefits, Douglas said nothing. In fact, he twice admitted in his deposition that he submitted hospital bills for his wife to the TWA plan, not United's, because it was clear that the latter plan would have excluded coverage of Susan's "pre-existing" medical condition. (Because of the Health Insurance Portability and Accountability Act of 1996, this barrier to coverage might not exist today. See Pub.L. 104–191, 110 Stat. 1936 (1996), codified at 29 U.S.C. §§ 1181, 1191.)

It is possible that no one would have noticed the accidental extension of coverage if Susan had not suffered from diabetes. She does, though, and in January and February 1995, she was admitted to the hospital on two or three separate occasions for in-patient treatment. Prior to each hospitalization, the Cokers sought pre-admission certification from Aetna Life Insurance Company, the third-party administrator of TWA's group plan, that the hospital stay would be covered under the plan. (A "third-party administrator" is an organization under contract to perform non-discretionary functions for a plan such as the ministerial review, approval,

and denial of claims, cf. *Harris Trust & Sav. Bank v. Provident Life & Accident Ins. Co.*, 57 F.3d 608, 613–14 (7th Cir.1995) (example of "third-party administrator"); it should not be confused with the ERISA plan "administrator," 29 U.S.C. § 1002(16)(A), which has many statutorily imposed duties and in this case is TWA.) Each time, Aetna approved the admissions, with the following caveat:

> Certification is based upon the medical information provided. This notice is *not* a guarantee of benefits. Payment of benefits is subject to any subsequent review(s) of medical information or records, the patient's eligibility on the date the service is rendered, and any other contractual provisions of the plan.

(Emphasis in original.) This warning did not inspire the Cokers to check either the SPD or the CBA, even though Douglas had received copies of both. The Cokers explain that they were by then lulled into a false sense of security because of their continuing receipt of medical cards from TWA and because they had received similar notices prior to 1995 without incident.

Whatever the reason, the 1995 hospitalizations provoked a different response from TWA. Aetna paid $10,895 of the $11,140 bill for the first hospitalization, but that transaction finally alerted TWA to the mistake it had made in treating Douglas and Susan as still eligible under its group benefit plan. TWA concluded that the Cokers' medical benefits should have ended no later than April 1994, when Douglas' and Susan's CO-BRA eligibility had plainly expired. TWA therefore refused to cover the nearly $45,000 bill for the other hospitalization(s), and it notified the Cokers on February 24, 1995 that they were not covered by the plan. Beginning in July 1995, the Cokers repeatedly and unsuccessfully resubmitted claims for benefits.

In the meantime, the IAM had been pursuing a grievance against TWA about the original furlough, claiming that the company had violated the CBA by using another airline's employees for certain tasks instead of its own workforce. In March 1995, the arbitrator

ruled in the union's favor and ordered TWA to reinstate the furloughed employees with whatever amount of backpay was necessary to bring their earnings up to the level they would have reached had it not been for the unlawful furlough. Under this formula, however, Douglas was entitled to nothing but reinstatement, because his income from other employment had exceeded what TWA would have paid him. In addition to backpay, the union had also asked the arbitrator to award "make-whole relief, including . . . benefits," but the award did not do so. Douglas chose to take advantage of his right to reinstatement at TWA, and he has worked there part-time since June 26, 1995, once again covered by its benefit plans.

TWA's claim denial and the failure of the arbitral award to require retroactive medical benefits led the Cokers to sue TWA, the Cooperative Group Insurance Plan for Employees of TWA Inc. ("the Group Plan"), and the Transworld Airlines Inc. Retirement Plan ("the Retirement Plan"). Count I of the complaint alleged that the Cokers were entitled to medical benefits under the federal common law estoppel theory that has developed under ERISA in this circuit; Count II alleged interference with protected rights under ERISA, see 29 U.S.C. § 1140; and Count III alleged breach of contract. In an order from which neither of the Cokers has appealed, the district court dismissed the plaintiffs' second and third claims because it found that those claims were minor disputes under the Railway Labor Act and were therefore subject to arbitration. See *Coker v. Transworld Airlines, Inc.*, 957 F.Supp. 158 (N.D.Ill.1997). The district court subsequently granted summary judgment in favor of the Retirement Plan on the plaintiffs' first claim because of the Cokers' failure to allege any wrongdoing by that entity, and in favor of TWA and the Group Plan on the merits. Only Susan has appealed, and she has limited her argument here to the promissory estoppel theory of Count I, and only as against TWA and the Group Plan.

## II

■ Before we reach the merits of Susan's claim, we must decide whether it was properly before the district court at all. Under the Railway Labor Act (RLA), which governs collective bargaining agreements in the airline industry, see *Hawaiian Airlines v. Norris*, 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994), there is a mandatory arbitral mechanism designed to handle disputes "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First(i). These are known in the trade as minor disputes, and they must be arbitrated. The distinguishing feature of a minor dispute is "that the dispute may be conclusively resolved by interpreting the existing CBA." *Id.* at 256, 114 S.Ct. 2239 (brackets omitted), quoting *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 305, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). Major disputes, by contrast, are those that concern rights independent of the CBA. *Hawaiian Airlines*, 512 U.S. at 256, 114 S.Ct. 2239. While an aggrieved party may sue in federal court immediately over a major dispute, courts should characterize a dispute as minor if it is even "arguably justified" that the dispute turns on the application of the CBA. *Id.* at 265–66, 114 S.Ct. 2239.

■ If Susan were seeking to assert a state law claim, the Supreme Court has made clear that the RLA's arbitral mechanism would preempt any effort to bring a claim that the RLA would characterize as a minor dispute. See *id.* at 253, 114 S.Ct. 2239. Susan, however, has alleged a violation of the federal common law interpreting ERISA. Preemption is not the applicable doctrine under these circumstances, since the question whether one federal law takes precedence over another does not implicate the Supremacy Clause. See, *e.g.*, *United States v. Estate of Romani*, 523 U.S. 517, 118 S.Ct. 1478, 140 L.Ed.2d 710 (1998) (interaction between Tax Lien Act and federal priority statute); *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (Securities and Exchange Act and antitrust laws). The choice between two federal statutes requires an analysis of both, to see if they are indeed incompatible or if they can be harmonized, and if they are incompa-

tible to decide which one Congress meant to take precedence. See *Hawaiian Airlines*, 512 U.S. at 252, 114 S.Ct. 2239; *Romani*, 118 S.Ct. at 1488 (choosing to harmonize both statutes rather than ask whether the latter statute repealed the former); *United States v. Fausto*, 484 U.S. 439, 451–55, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988) (applying relevant canons of statutory interpretation to the Back Pay Act and the later-enacted Civil Service Reform Act). We therefore must decide here whether Congress intended to make ERISA override the entire RLA structure, or if jurisdiction over ERISA claims follows the same kind of "minor dispute, major dispute" line that applies elsewhere for RLA claims. If the latter is true, we must then decide whether Susan's claim was minor, in which case the district court should have dismissed it; if the dispute was major, we can proceed to the merits.

■ Even though ERISA expressly confers jurisdiction on the federal courts to resolve suits over the coverage and application of employee benefit plans, 29 U.S.C. § 1132, it also states that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d). Other courts of appeals have construed this language to preserve the exclusive jurisdiction of the Adjustment Board under the RLA over the arbitration of minor disputes. See, *e.g.*, *Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots*, 994 F.2d 692, 694 (9th Cir.1993); *Bowe v. Northwest Airlines*, Inc., 974 F.2d 101, 103 (8th Cir.1992); *Beard v. Carrollton R.R.*, 893 F.2d 117, 123 (6th Cir.1989); *de la Rosa Sanchez v. Eastern Airlines, Inc.*, 574 F.2d 29, 33 (1st Cir.1978). We agree. This court adopted the same approach for a claim arising under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 55, in *Monroe v. Missouri Pacific R.R. Co.*, 115 F.3d 514 (7th Cir.1997), and we see no reason to treat ERISA any differently, particularly given the directive of § 1144(d), *supra*. We therefore hold that where the RLA applies, the *Hawaiian Airlines* distinction between major and minor disputes controls our adjudication of ERISA claims, just as it does for claims arising under the FELA or state law.

■ The next question is whether Susan's claim is major or minor. Despite the RLA's solicitous standard favoring the finding of minor disputes where "arguably justified," we agree with the district court that Susan's promissory estoppel claim was a major dispute and hence one that did not fall within the exclusive jurisdiction of the Adjustment Board. Though TWA correctly points out that the reason she had any claim at all to medical benefits traced back to the CBA, hers was not a claim that could "be conclusively resolved by interpreting the existing CBA." *Hawaiian Airlines*, 512 U.S. at 256, 114 S.Ct. 2239 (brackets omitted). It turned instead on factual questions such as whether TWA misrepresented (either intentionally or negligently) to the Cokers any material facts about their coverage and whether the Cokers reasonably relied to their detriment on such misrepresentations. The promise Susan is trying to estop TWA from denying—its act of mailing benefit cards to her each year—can be found nowhere in either the CBA or the health plan documents. As we held in *Monroe*, "not all cases which tangentially touch collective bargaining agreements call for . . . preemption." 115 F.3d at 519 (ellipsis in original), quoting *Loewen Group Int'l, Inc. v. Haberichter*, 65 F.3d 1417, 1423 (7th Cir.1995). Susan's estoppel case arises under the federal common law of ERISA, not under the CBA; it is a major dispute, and as such, it is properly before us.

### III

Our review of the district court's summary judgment in TWA's favor is, of course, *de novo*, and we have taken the facts in the light most favorable to Susan. Her principal argument is that TWA made a written representation that she was covered by the Group Plan when it sent certain documents to her after Douglas was furloughed. Key among those documents were the insurance and prescription benefit cards, which she received in November 1993 and again in November 1994. On November 1, 1994, the Cokers also received a form letter addressed to them which

began, in large bold-face letters, with the statement: **"TWA GROUP PLAN OR HMO * * THE CHOICE IS YOURS * *."** This letter informed its recipients about the open enrollment period during which time employees could change health care plans, and its entire tenor implied that the recipient was entitled to medical coverage from TWA. Finally, Susan argues that the "preadmission certifications" that Aetna issued before her hospitalizations were further written statements attributable to TWA that evidenced coverage. She claims that she relied on these indications of coverage and did not purchase alternative insurance, and thus that TWA is now estopped from denying her benefits.

Before addressing the merits of Susan's argument, it is useful to review the law governing estoppel claims under ERISA. It is not easy to apply estoppel principles to ERISA cases in the face of the rule requiring modifications to plans to be in writing, 29 U.S.C. § 1102(a)(1), and the required procedures for amending plans, 29 U.S.C. § 1102(b)(3). Accordingly, some circuits have held that *all* claims based on the doctrine of estoppel are inconsistent with the ERISA statute. See, *e.g., Miller v. Coastal Corp.*, 978 F.2d 622, 624–25 (10th Cir.1992). This court, however, has recognized a form of estoppel as a matter of federal common law in at least some ERISA cases. See *Black v. TIC Investment Corp.*, 900 F.2d 112, 115 (7th Cir.1990), reaffirmed in *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 650 (7th Cir.1993). Still, a number of our cases since *Black* have emphasized the narrow scope of such claims. For example, a number of later cases have held that the estoppel doctrine does not override the rule forbidding oral modifications to an ERISA plan. See, *e.g., Frahm v. Equitable Life Assurance Soc'y*, 137 F.3d 955, 961 (7th Cir.1998); *Schmidt v. Sheet Metal Workers' Nat'l Pension Fund*, 128 F.3d 541, 546 (7th Cir.1997); *Russo v. Health, Welfare & Pension Fund, Local 705, IBT*, 984 F.2d 762, 767 (7th Cir.1993). Accord *Weir v. Federal Asset Disposition Ass'n*, 123 F.3d 281, 289 (5th Cir.1997); *Cannon v. Group Health Svc. of Oklahoma*, Inc., 77 F.3d 1270, 1276 (10th Cir.1996). *Black* expressly limited its holding to "claims for benefits under unfunded single-employer welfare benefit plans" out of concern that a broader application of estoppel principles might pose a risk to plans that rely on actuarial soundness. 900 F.2d at 115. We have repeatedly declined to decide whether estoppel reaches beyond this original limitation. *Russo*, 984 F.2d at 767; *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 280 (7th Cir.1994). We have no occasion to do so here, because Susan has alleged that TWA's medical plan is also a single-employer unfunded employee welfare plan.

Unfortunately, our cases have not employed a consistent nomenclature when speaking of the estoppel-based cause of action that we recognized in the ERISA context. *Black* referred merely to "estoppel." In some cases we have spoken of "equitable estoppel," see, *e.g., Schmidt*, 128 F.3d at 546; *Thomason*, 9 F.3d at 647, and in others we have referred to "promissory estoppel." See, *e.g., Miller v. Taylor Insulation Co.*, 39 F.3d 755, 758–59 (7th Cir.1994). Still other cases refer to both theories. See, *e.g., Krawczyk*, 41 F.3d at 280 (first discussing "estoppel," and then discussing as an alternative theory "equitable estoppel"); *Pohl v. National Benefits Consultants, Inc.*, 956 F.2d 126, 127 (7th Cir.1992) (finding that the parties were arguing neither theory). Likewise, our formulation of the required elements has varied. Compare *Black*, 900 F.2d at 115 (emphasizing two factors) with *Miller*, 39 F.3d at 759 (emphasizing three factors) with *Krawczyk*, 41 F.3d at 280 (emphasizing four factors).

Rather than delving into a discussion about the arcane "varieties" of estoppel under ERISA, see generally Comment, Kimberly A. Kralowec, *Estoppel Claims Against ERISA Employee Benefit Plans*, 25 U.C. Davis L.Rev. 487 (1992)—if indeed there is a meaningful difference, *id.* at 494 n. 52—we think it simpler to restate, clearly, what has been implicit in all of our estoppel cases in the ERISA context. The cause of action has four elements: (1) a knowing misrepresentation; (2) made in writing; (3) with reasonable reliance on that misrepresentation by the plaintiff; (4) to her detriment. A claim will *not* lie for every false statement reasonably and detrimentally relied upon by an unwitting plaintiff. As we commented in

*Decatur Mem'l Hosp. v. Connecticut Gen. Life Ins. Co.*, 990 F.2d 925, 926–27 (7th Cir. 1993), "[a]rguments that negligent misrepresentations 'estop' sponsors or administrators from enforcing the plans' written terms have been singularly unsuccessful." See also *Pohl*, 956 F.2d at 127; *Vershaw v. Northwestern Nat'l Life Ins. Co.*, 979 F.2d 557, 559 (7th Cir.1992) (refusing to estop insurer where basis for estoppel was "innocent" error very similar to the one before us here). Thus, "[t]o the extent that the common law will sometimes hold parties to the terms of a misleading representation for no reason other than the circumstance that such a misleading representation was made, such is not the common law of ERISA in this Circuit." *Thomason*, 9 F.3d at 649.

■■■■ Even assuming for the sake of argument that Susan detrimentally relied on TWA's written mailings that led her to believe she continued to enjoy medical coverage, her estoppel claim fails for lack of reasonable reliance. Susan could not have reasonably relied on the mailings from TWA in light of her easy access to convenient ways of ascertaining the true facts about her medical coverage. Douglas had copies of the CBA, the SPD, and the memorandum TWA disseminated at the September 30 meeting. Susan argues that whatever Douglas may have known or had in his possession is irrelevant to her claim since ERISA and COBRA both require that notice be given to participants *and* spouse-beneficiaries, see 29 U.S.C. §§ 1021(a), 1022, 1024(b) (ERISA); 29 U.S.C. § 1166 (COBRA). True enough, but her point does not persuade. First, she did not raise this argument at summary judgment, which means she cannot raise it on appeal. *Bruner Corp. v. R.A. Bruner Co.*, 133 F.3d 491, 497 (7th Cir.1998). Even if the point had been preserved, Susan failed to develop it until her reply brief, which again is a day late and a dollar short. *James v. Sheahan*, 137 F.3d 1003, 1007 (7th Cir.1998). Finally, Susan's deposition testimony was merely that she could not *recall* reading any notices about her rights—a far cry from saying that TWA failed to supply her with information that it should have by statute.

Susan's claim of reasonable reliance is too far-fetched to believe for other reasons as well. While the Cokers had no reason to question the medical cards they received for the first 12 months—or even the first 18 months if one charitably assumes that Susan reasonably thought COBRA benefits were free—it defies common sense to think that a company for which one was not presently working, that was not paying a current wage or salary, and that had (as of then) made no promise of reinstatement, would continue indefinitely to afford health coverage for the spouse of a former employee. Likewise, although she seems to believe that the certifications from Aetna she received prior to her hospitalizations help her case, they are instead, if anything, harmful to it. Aetna explicitly warned that it was not making any judgment about eligibility or coverage. No jury could conclude that an interpretation of the certifications that squarely contradicted those statements was a reasonable one. (We need not decide whether Aetna's statements should in any event be attributable to TWA, although agency principles under ERISA may support some form of attribution. See, e.g., *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 404–05 (7th Cir.1996) (attributing the actions of a third-party administrator to the plan sponsor/administrator for the purpose of deciding if the SPD had been followed).)

■■■■ Finally, Susan's claim also fails because there was no hint that TWA intentionally set out to mislead her or anyone else. At worst, it was guilty of bureaucratic sloppiness when it did not delete the Cokers from the rolls of active health plan participants after 12 months had elapsed and instead sent them new prescription and insurance benefits cards. As we mentioned earlier, the recognition of negligent misrepresentations as a basis for estoppel claims is inconsistent with the policy concern about not undermining the actuarial soundness of an ERISA plan. See *Black*, 900 F.2d at 115. Sound policy aside, the equities do not favor Susan: TWA paid for its mistakes, insofar as it provided free health insurance for her for a substantially longer period of time than it was required to do, and we understand that it is not trying to

recoup anything for that period. It just wanted to turn off the spigot when it learned of the mistake, and we hold that it was entitled to do so.

Susan has made a number of additional arguments on appeal, including a request to this court not to give any deference to TWA's decision to stop providing coverage, a claim that the RLA arbitrator's decision reversing the furlough has some relevance to this dispute, and a procedural argument that TWA's tardiness in answering the complaint should redound to her benefit. We have considered these points and others she has raised and find them to be without merit. The decision of the district court is therefore AFFIRMED.