Paul D. STANG, Plaintiff,

v.

**CLIFTON GUNDERSON HEALTH CARE PLAN, Defendant.**

No. 98–C–0631–C.

United States District Court, W.D. Wisconsin.

July 30, 1999.

Robert E. Shumaker, Dewitt Ross & Stevens, Madison, WI, for plaintiff.

David G. Lubben, Davis & Campbell, L.L.C., Peoria, IL, defendant.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for injunctive relief, plaintiff Paul D. Stang contends that his

employer's health care plan, defendant Clifton Gunderson Health Care Plan, impermissibly denied health care coverage to his dependent son under 29 U.S.C. § 1182(a)(1) (the nondiscrimination provision of the Health Insurance Portability and Accountability Act, codified as a provision of the Employment Retirement Income Security Act). The nondiscrimination provision prevents group health plans from denying enrollment to dependents because of medical history. The Health Insurance Portability and Accountability Act becomes effective for group health plans on the first day of the first plan year following June 30, 1997. At the heart of this case is whether the act applied to plaintiff's application for coverage effective January 1, 1998, and, if not, whether defendant should be estopped from denying coverage to plaintiff's son because it misled him into believing the act would apply at that time.

Jurisdiction is present. 28 U.S.C. § 1331; 29 U.S.C. § 1132(e)(1). Presently before the court are the parties' cross motions for summary judgment. From the undisputed facts I find that the act became effective for defendant on February 1, 1998; therefore, the act did not apply to plaintiff's application for coverage effective January 1, 1998. Because I find that act did not apply to plaintiff's application for coverage effective January 1, 1998, and that defendant cannot be estopped from denying plaintiff's son health care coverage, defendant's motion for summary judgment will be granted and plaintiff's will be denied. Because plaintiff cannot succeed on the merits of his claim, it·is a moot point whether he will likely suffer irreparable harm entitling him to injunctive relief.

From facts proposed by the parties, I find the following to be material and undisputed.

## FACTS

Plaintiff's family consists of his wife Carol and three children. Plaintiff's son Evan was born in 1995 and suffers from a kidney disorder known as nephrotic syndrome. He has been seen by physicians and receives treatment with prescription drugs for this syndrome.

Until October 17, 1997, plaintiff was employed by DCA, Inc., in its Madison, Wisconsin office. While employed there, plaintiff and his family were covered by a group health plan maintained by DCA. At the same time, Carol was employed at Bank One Corporation, which also maintained a group health plan for its eligible employees. Under the Bank One health plan, eligible employees are provided an annual open enrollment opportunity with enrollment effective on January 1. Carol was eligible for family coverage under the plan, but did not elect such coverage because she and plaintiff preferred coverage under the DCA health plan.

While plaintiff was employed by DCA, it closed its Madison office and terminated his employment, effective October 17, 1997. Coverage under the DCA health plan was scheduled to end on that date, subject to the continuation coverage rules under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).

On October 20, 1997, plaintiff became employed at the Madison office of Clifton Gunderson L.L.C., a certified public accounting firm headquartered in Peoria, Illinois. Before working for Clifton Gunderson, plaintiff had had fourteen years' experience as a lawyer specializing in employee benefit trust administration and management and retirement plan sales and administration. In addition, plaintiff has been a chartered life underwriter since 1986.

Clifton Gunderson maintains a self-insured health benefit plan for its employees that is an employee welfare benefit plan as defined by 29 U.S.C. § 1002(1) and a group health plan as defined by § 1191b(a)(1). Clifton Gunderson is the named fiduciary of the plan in accordance with 29 U.S.C. § 1102(a)(1) and the administrator of the plan in accordance with § 1002(16)(A). At all times relevant to this dispute, certain underwriting and ad-

ministrative services were provided to the plan by Employee Benefits Corporation, a division of John P. Pearl & Associates. The Clifton Gunderson plan document does not contain any provision defining the plan year end. However, the Summary Plan Document states that the plan year begins on February 1st. Plaintiff was given a copy of the Summary Plan Document.

Joanne Throndson, administrator of Clifton Gunderson's Madison office, informed plaintiff that he could enroll himself and his family for coverage under the plan without being subject to medical underwriting if he did so within 30 days of hire. She gave plaintiff a package of plan enrollment documents that included a "Group Insurance Enrollment Form." Between October 20, 1997, when he started work, and November 4, 1997, plaintiff had conversations with three members of Clifton Gunderson's human resources department, Joyce King, Gina Harris and Teresa Speck, all of whom informed him that applications for coverage after the first thirty days of employment would be subject to medical underwriting.

Plaintiff and his wife discussed which health plan they should choose for coverage for themselves and their children for the period after October 31, 1997, the scheduled date of termination of coverage under the DCA health plan. The two options they discussed were (1) continuing coverage under the DCA plan for November and perhaps December, pursuant to the COBRA election to be made by plaintiff within the 60–day period ending December 31, and then coverage under Carol's Bank One health plan as of January 1, 1998; or (2) coverage under plaintiff's Clifton Gunderson plan pursuant to an election by plaintiff within 30 days of hire. They decided upon the first option. On October 30, 1997, Carol telephoned the Bank One electronic enrollment system and electronically elected family coverage under the Bank One plan effective January 1, 1998.

In early November, Clifton Gunderson provided its employees with three documents pertaining to coverage under the Clifton Gunderson health plan. The first document was entitled "Important Information regarding the New Health Care Law and how it affects your enrollment and coverage under the Clifton Gunderson Health Care Plan." That document states: "Attached is an explanation of how the Health Insurance Portability and Accountability Act of 1996 (HIPAA) affects the Clifton Gunderson Health Care Plan. The law becomes effective for our plan on January 1, 1998." The second document was a memorandum dated November 6, 1997 from Teresa Speck of the Clifton Gunderson human resources department in Peoria. That document contains the statement: "As you may already have heard, there is a new federal law that will affect the Clifton Gunderson Health Care Plan effective January 1, 1998. It is called the Health Insurance Portability Act [sic] of 1996 (HIPAA)." The document continues: "To apply for coverage, you will need to complete the Group Evidence of Insurability form, which you can obtain from your OA. This application is subject to the approval of the CG Health Care Plan's underwriters (John Pearl)." The third document was entitled "Clifton Gunderson Health Care Plan Improvements Effective January 1, 1998" and contained the statement "The Health Insurance Portability and Accountability Act of 1996 (HIPAA) becomes effective for the CG Plan on January 1, 1998." The plan adopted the following post–1997 eligibility restriction: if an eligible employee does not enroll for coverage under the plan within 30 days after hire, the plan will not provide coverage except as required by the special enrollment rules of ERISA. Plaintiff was not informed of these restrictions until he received the Enrollment Notice, the HIPAA Explanation, and the Plan Amendment Notice in November 1997. The Enrollment Notice and the HIPAA Explanation state that eligible employees not currently covered under the Clifton Gunderson plan may

apply for coverage effective January 1, 1998. They also state that an application for coverage effective January 1, 1998 will be treated as a late enrollment application subject to medical underwriting.

After receiving that information, plaintiff and his wife discussed again which health plan coverage they should choose for the period beginning January 1, 1998. They considered the same options they had discussed previously. They decided upon the second option: coverage under the Clifton Gunderson plan. They made this decision for three reasons: (1) premiums under the Clifton Gunderson plan would be less than under the Bank One plan; (2) the post–1997 eligibility restrictions under the Clifton Gunderson plan meant that if plaintiff let this enrollment opportunity pass by, he would not be eligible for coverage under the plan unless and until his wife lost coverage under the Bank One plan; and (3) they believed the Health Insurance Portability and Accountability Act would be applicable to the plan as of January 1, 1998 and that its nondiscrimination provision would prohibit the plan from denying coverage to Evan because of his medical history.

After deciding to enroll in the Clifton Gunderson plan, plaintiff asked Throndson for the necessary forms. She gave him a package of documents that included a "Group Insurance Enrollment Form" but, according to plaintiff, did not include a "Group Evidence of Insurability" form. Plaintiff did not ask for that form. On December 1, 1997, plaintiff completed and submitted the enrollment form. On December 17, 1997, plaintiff elected COBRA coverage under the DCA health plan for November 1997. He did not pay for coverage for December because the family had not incurred any medical expenses for that month and the cost would have been nearly five hundred dollars. He did not elect further COBRA coverage.

On November 17, 1997, Carol wrote to Bank One, stating: "My husband's medical plan requires that our family enroll for 1998 or we will be excluded permanently

from that plan. Consequently, I request the medical benefit plan I enrolled in for 1998 to be canceled." On November 24, 1997, Bank One wrote back, acknowledging the decision to reverse the election of coverage and requesting that Carol complete and return a form to confirm the reversal. On November 26, 1997, Carol completed the form and faxed it to Bank One.

Defendant did not inform plaintiff at any time during December 1997 that his entire family would not be covered under the plan. Defendant did not request information regarding the medical condition of plaintiff or any member of his family during that month. On December 31, 1997, Clifton Gunderson's human resource department sent a notice entitled "Benefits Update # 5" to all employees, informing them that cards identifying them as being covered by defendant had been mailed to their houses the day before.

On January 6, 1998, Speck telephoned plaintiff and informed him that he must obtain, complete and return a "Group Evidence of Insurability" form for his application to be processed. Speck told plaintiff that she would process the insurability form as if he had submitted it with the enrollment form on December 1, 1997. Plaintiff informed Speck that Evan had a medical condition and expressed concern about being required to provide the information that the form would request. Plaintiff requested the insurability form from Throndson. That day, plaintiff completed and signed the form, then faxed it back. Concerned about the timeliness of the request for the form, plaintiff did not date it.

On January 8, 1998, plaintiff faxed Speck a copy of a notice regarding ERISA Technical Release No. 97–2, which he believed supported his position that the act's nondiscrimination provision prohibited defendant from denying coverage to Evan effective January 1, 1998, because of his medical history. On January 20, 1998, plaintiff sent Speck an e-mail message ask-

ing whether Pearl, the underwriter, had made a decision on his application for coverage. Speck responded that day, stating that the application was still pending.

On January 21, plaintiff received an e-mail from Joyce King of the Clifton Gunderson human resources department, stating that Pearl needed information from Evan's physicians and suggesting that he contact the physicians to ask whether they had received an information request from Pearl. Later that day, Ann Ogden at Pearl faxed plaintiff a "Authorization to Release Information" form, authorizing all physicians and all other health providers to release medical information to Pearl. Plaintiff signed the form and faxed it back to Pearl that day. Plaintiff sent King an e-mail asking about defendant's position on the effective date of the act for the plan and indicating that he had sent King the notice about ERISA Technical Release 97–2.

On January 22, 1998, plaintiff called Ogden and said that he could not understand why medical underwriting was involved because he believed the act became effective for the plan on January 1, 1998. Ogden replied that underwriting was required because plaintiff's application had been submitted on December 1, 1997.

On January 28, 1998, plaintiff sent King an e-mail requesting confirmation that Pearl had received the medical information it sought. Speck responded by sending an e-mail stating that Pearl had received the information. Speck also sent plaintiff a memorandum dated January 28, 1998, providing her interpretation of ERISA Technical Release 97–2. The final paragraph of the memorandum states that Ogden, the underwriter, had received the information regarding Evan that day, that plaintiff and his other eligible dependents would be approved regardless whether Evan as approved, that plaintiff would be provided a final approval letter after Evan's records were reviewed, and that King would contact plaintiff when she heard officially from Ogden.

On February 4, 1998, DCA mailed plaintiff a letter stating that his COBRA coverage under the DCA plan had terminated on November 30, 1997, because he had not paid premiums for months after November. Although Carol had reversed her coverage election under the Bank One plan, Bank One withheld premium payments from her paychecks during all of 1998. Fearing that defendant might deny coverage for Evan, Carol never notified Bank One that the withholdings from her paychecks were inconsistent with her coverage cancellation.

On February 6, 1998, Speck sent plaintiff an e-mail stating that Pearl had denied coverage for Evan but approved coverage for plaintiff and the rest of his family. That same day, plaintiff sent Speck an e-mail. He requested that the denial be put in writing, questioned whether Evan was being excluded permanently or only for a limited period because of a pre-existing medical condition, and stated that plaintiff should not be enrolled in the plan if Evan would not be covered.

On February 9, 1998, Speck sent plaintiff an e-mail stating that Evan would be excluded "until and unless you lose coverage for him under your spouse's plan" and that plaintiff could appeal the denial of coverage by written letter. On February 11, 1998, plaintiff received a notice from Pearl that it had denied coverage for Evan because of his medical history.

On March 19, 1998, after a series of communications between the parties, plaintiff faxed Pearl a letter dated March 18, appealing the denial of coverage for Evan. Pearl denied the appeal by a letter of the same date. On April 1, 1998, Speck sent plaintiff an e-mail stating that no further appeals were available and that defendant believed that it had complied with all HIPAA requirements.

## OPINION

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to

judgment as a matter of law. Fed. R.Civ.P. 56(c); *Weicherding v. Riegel*, 160 F.3d 1139, 1142 (7th Cir.1998). All evidence and inferences must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Employee Retirement Income Security Act applies to "any plan, fund or program which was heretofore and hereinafter established or maintained by an employer or employer organization or both." 29 U.S.C. § 1002(1). The parties agree that defendant is a "group health plan" as defined by 29 U.S.C. § 1191b(a)(1). 29 U.S.C. § 1182(a)(1) was created by § 101(a) of P.L. 104–191, the Health Insurance Portability and Accountability Act of 1996. That provision prohibits group health plans from denying enrollment of any individual or a dependent of the individual because of his health status, medical condition, claims experience, receipt of health care, medical history, genetic information, evidence of insurability or disability. P.L. 104–191, § 101(g)(1), provides that the nondiscrimination provision (that is, § 1182(a)(1)), applies to group health plans for plan years beginning after June 30, 1997, 29 U.S.C. § 1132(a)(3) authorizes a civil action to obtain equitable relief for violations of the act. Section 101(g)(5) of Public Law 104–191 provides that no "enforcement action" shall be taken against a group health plan before January 1, 1998, or, if later, the date of issuance of final regulations by the Department of Labor, if the plan has sought to comply in good faith with the requirements of the act.

It is undisputed that because defendant's decision to deny coverage for Evan was not based on an interpretation of the plan itself but rather on an interpretation of law, that is, that the Health Insurance Portability and Accountability Act did not apply to applications for coverage effective January 1, 1998, its decision is subject to de novo review. *See Penn v. Howe–Baker Engineers, Inc.*, 898 F.2d 1096, 1100 (5th Cir.1990). Moreover, it is undisputed that even if defendant's decision had been based on an interpretation of the plan document, that document does not provide the plan administrator with discretion to determine eligibility; therefore, its decision would be subject to de novo review. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Ramsey v. Hercules, Inc.*, 77 F.3d 199, 202 (7th Cir. 1996).

As an initial matter, defendant raises two challenges to plaintiff's standing to bring this suit and to this court's jurisdiction to decide it. The first may be disposed of quickly. Defendant argues that because plaintiff could have enrolled in the plan within thirty days of hire without medical underwriting, thereby avoiding this dispute, he should be barred from bringing it. Defendant cites no support for the proposition that failure to take advantage of the opportunity to enroll without underwriting bars recovery for a plaintiff under the act, and research reveals none. "Arguments that are not developed in any meaningful way are waived." *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 1999 WL 371671, *7 (7th Cir.1999); *see also Finance Investment Co. (Bermuda) Ltd. v. Geberit AG*, 165 F.3d 526, 528 (7th Cir.1998); *Colburn v. Trustees of Indiana University*, 973 F.2d 581, 593 (7th Cir. 1992) ("[plaintiffs] cannot leave it to this court to scour the record in search of factual or legal support for this claim"); *Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs, Benefits Review Board*, 957 F.2d 302, 305 (7th Cir.1992) (court has "no obligation to consider an issue that is merely raised, but not developed, in a party's brief").

■ Defendant's second challenge to plaintiff's ability to bring this suit is more difficult. Section 101(g)(5) of the act pro-

vides that no enforcement action shall be taken against a group health plan before January 1, 1998, or, if later, the date of issuance of final regulations by the Department of Labor, if the plan or issuer has sought to comply in good faith with the act's requirements. Defendant contends that because final regulations have not yet been issued, plaintiff may not bring this action absent a finding that defendant has acted in bad faith. The question is whether the term "enforcement actions" applies only to actions brought by the regulatory agencies that enforce ERISA, particularly the Department of Labor, or to actions brought by private parties as well.

The legislative history of the provision reveals little; it simply states that "A good faith compliance provision is provided with respect to a transition period." House Conf.Rep. No. 104–736, 104th Cong., 2d Sess. 177, 234, *reprinted in* 1996 U.S.C.C.A.N. 1990, 2047. However, some language in the legislative history indicates that the term "enforcement actions" refers to actions brought by the Department of Labor: "The Secretary of Labor would not enforce the provisions of Title I applicable to health insurance issuers. However, private right of action under part V of ERISA would apply to such issuers." *Id.* at 192. Part V of ERISA includes actions under 29 U.S.C. 1132(a), the section under which plaintiff brings the present action. The distinction between the "right of action" brought by private parties and actions to "enforce" the provisions of Title I suggests that "enforcement actions" refer to actions brought by the Department of Labor. In addition, this interpretation is the most logical: until the Department of Labor releases final regulations, in fairness it cannot enforce them. Moreover, one would expect that if Congress had intended to exempt the provisions of § 1182 from the private right of action available to plaintiffs under § 1132(a) even for a limited time, it would have made that exemption more explicit. To exempt only § 1182 from the private right of action available under § 1132(a) renders that section inconsistent with ERISA as a whole.

Although it is a close call, I interpret the term "enforcement actions" to apply to actions brought by the Department of Labor to enforce the act's provisions pursuant to its regulatory authority as opposed to private actions brought by plan participants.

■ Having disposed of defendant's challenges to plaintiff's standing to bring this suit and the jurisdiction of the court to decide it, I can examine the merits of plaintiff's claim. The parties agree that upon the effective date of the act's nondiscrimination provision, defendant could no longer exclude coverage for Evan on the basis of his medical history. The parties also agree that the effective date of the act's nondiscrimination provision with respect to the plan was the first day of the first plan year that began after June 30, 1997. 29 C.F.R. § 2520.102–3(r) requires that group health plan Summary Plan Documents state when the plan years begins. Defendant's Summary Plan Document states that the plan year begins February 1st.

Plaintiff argues that the three November 1997 notices that defendant disseminated to Clifton Gunderson employees either effectively changed the start of the plan year to January 1st or misrepresented that the change had occurred and that he relied reasonably on that misrepresentation to his detriment. The three November notices each stated that the act would become effective for the plan as of January 1, 1998 and that defendant was offering a special enrollment effective January 1, 1998. Plaintiff argues that because the act, when effective, would prevent medical underwriting with regard to coverage for Evan, enrollment effective January 1, 1998 could not be subject to medical underwriting if the act was also effective for the plan as of January 1, 1998.

Plaintiff cites no support for his proposition that the November notices changed the start date of the plan year to January 1st from February 1st. Rather, plaintiff asserts this is the only logical conclusion

one could draw from the notices because they state that the act will become effective for the plan as of January 1, and under its own terms the Act becomes effective for plans on the first day of the first plan year following June 30, 1997. Although this is a logical conclusion one could draw from the notices, doing so does not effect an alteration of the substantive provisions of the plan or its Summary Plan Description. Plaintiff cites no law or fact to support his assertion that defendant actually changed the start date of the plan year from January 1st to February 1st by the wording of its November notices.

■ Plaintiff's stronger argument is that even if the notices did not actually change the plan year, they misrepresented that the act would apply to the plan beginning on January 1 (thereby preventing medical underwriting for enrollment effective on that date) and that he relied reasonably on that misrepresentation to his detriment. Therefore, he maintains, defendant should be estopped from denying coverage for Evan even though the act did not apply to enrollments beginning before February 1, 1998.

■ "A claim will not lie for every false statement reasonably and detrimentally relied upon by an unwitting plaintiff." *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 585 (7th Cir.1999). In fact, " '[a]rguments that negligent misrepresentations "estop" sponsors or administrators from enforcing the plans' written terms have been singularly unsuccessful.' " *Id.* at 586 (citations omitted); *see also Vershaw v. Northwestern Nat'l Life Ins. Co.*, 979 F.2d 557, 559 (7th Cir.1992) (no estoppel where basis of estoppel was inadvertent error). To make out an estoppel claim in the ERISA context, plaintiff must establish four elements: (1) a knowing misrepresentation; (2) made in writing; (3) upon which he relied reasonably; (4) to his detriment. *Id.*

■ Plaintiff's estoppel claim fails because there is no evidence to suggest that defendant knowingly misled him. Sloppiness and inconsistency are not mens rea.

The Court of Appeals for the Seventh Circuit has decided that merely negligent misrepresentation will not form the basis of estoppel claims in ERISA cases; the misrepresentation must be knowing. *See id.* It may be frustrating to allow a plan to escape unscathed when it has made a negligent (but not intentional) misrepresentation upon which a potential participant actually relied, but it is the law of the circuit.

■ Moreover, even if defendant's misrepresentation was knowing, plaintiff's estoppel claim would fail because his reliance on defendant's inconsistent statements was unreasonable. There can be no doubt that the November notices were misleading in saying that the act would be effective for defendant's plan beginning on January 1, 1998. It appears that plaintiff was actually misled by those statements. However, it is important to remember that defendant never stated that underwriting would not be applied to the special enrollment effective January 1, 1998. Quite the opposite, in fact: defendant specifically stated both in writing and orally that medical underwriting would apply to applications for the January 1st special enrollment. It is undisputed that two of the three November notices made clear that the special enrollment opportunity effective January 1 would be subject to medical underwriting and that plaintiff read those notices. In addition, it is undisputed that plaintiff was informed several times by three different employees in the human resources department that medical underwriting would be applied to applications for enrollment submitted after his first thirty days of employment.

Plaintiff concluded that underwriting could not be applied to the January 1st special enrollment because he knew that the act prevented underwriting and defendant had stated the act was effective for the plan on January 1st. Plaintiff's interpretation of the November notices conflicted squarely not only with language within those notices, but also with his conversa-

tions with human resources staff members and the Summary Plan Document.

In *Coker*, the plaintiff argued that TWA should be estopped from denying coverage to her despite the fact that her husband had not been employed by defendant for several years and the Summary Plan Document made clear she was not entitled to coverage. TWA had continued to send the plaintiff insurance and prescription benefit cards and to pay medical expenses she submitted to it. The court of appeals found that even if TWA's actions had misled the plaintiff to believe she continued to enjoy medical coverage, she could not have relied reasonably on those actions because it defied both the Summary Plan Document and common sense to believe that an employer would continue to provide free coverage for the spouse of a former employee for years after the employee had been furloughed.

In *Coker*, the plaintiff was faced with inconsistent statements from the Summary Plan Document on the one hand and the coverage cards she continued to receive from TWA on the other. Similarly, plaintiff was faced with inconsistent statements within the November notices on the one hand and the Summary Plan Document and statements by human resources employees on the other. Plaintiff reasonably could have been confused by defendant's inconsistent statements that the act would be effective on January 1, 1998, and that enrollment on that date would be subject to medical underwriting, but he could not have relied reasonably on those statements to believe that enrollment on that date would not be subject to medical underwriting. Clearly inconsistent statements may be the basis for genuine confusion, but they are not the basis for reliance that is reasonable. As with the plaintiff in *Coker*, plaintiff's reliance on defendant's inconsistent statements was unreasonable.

 Plaintiff raises one final argument that the act applies to his application for coverage wholly separate from his claim that the act was effective for enrollment on January 1, 1998, or at least that defendant should be estopped from acting otherwise. Defendant rendered its decision with regard to plaintiff's application for coverage on February 6, 1998. Plaintiff argues that even if, as defendant contends, the plan year did not begin until February 1, 1998 (and therefore the act was not effective for the plan until that date), Evan is entitled to the protections of the act because defendant rendered its decision after February 1st.

The act applies in the first plan year starting after June 30, 1997. There are no statutory instructions or prior cases addressing the situation in which an application for coverage is submitted and decided in two different plan years. However, in this case it is undisputed that plaintiff's application was for enrollment effective January 1, 1998, that is, during the plan year *before* the first plan year starting after June 30, 1997. In fact, all of plaintiff's family except Evan was approved on February 6 for coverage effective as of January 1. Therefore, the application did not become effective in the first plan year starting after June 30, 1997, and the act did not apply to it. Because plaintiff's application was treated in all other respects as if it were effective January 1, it is inconsistent to hold that for purposes of the act the application was effective only after January 31.

### ORDER

IT IS ORDERED that:

1. Plaintiff Paul D. Stang's motion for summary judgment is DENIED; and

2. Defendant Clifton Gunderson Health Care Plan's motion for summary judgment is GRANTED; and

3. The clerk of court is directed to enter judgment for defendant and close this case.